UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: | Chapter 11 |
| | |
| TELEXFREE, LLC , | Case No. 14-40987-MSH |
| TELEXFREE, INC., | Case No. 14-40988-MSH |
| TELEXFREE FINANCIAL, INC., | Case No. 14-40989-MSH |
| Debtors. | Jointly Administered |

## MOTION BY CHAPTER 11 TRUSTEE TO ESTABLISH OMNIBUS PROCEDURES FOR THE RESOLUTION OF DISPUTED PARTICIPANT CLAIMS

To the Honorable Melvin S. Hoffman, Chief United States Bankruptcy Judge:

Stephen B. Darr, the duly appointed Chapter 11 trustee (the "Trustee") of the bankruptcy estates (the "Estates") of TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. (collectively, the "Debtors" or "TelexFree"), respectfully requests, pursuant to Section 105 of the Bankruptcy Code and Rule 3007(c) of the Federal Rules of Bankruptcy Procedure ("FRBP"), entry of an order establishing omnibus procedures (the "Procedures") for the resolution of disputed claims in these proceedings, including relief from certain limitations on claims objections set forth in FRBP 3007 and Mass. Local Bankruptcy Rule ("MLBR") 3007. The Procedures are applicable only to the resolution of Participant claims. Claims of non-Participants are not covered by this motion and will be addressed separately.

### INTRODUCTION

TelexFree operated one of the largest Ponzi and pyramid schemes in United States history, ensnaring upwards of 1,000,000 Participants who collectively lost in excess of $1,700,000,000. TelexFree used the sale of voice over internet protocol service packages as a

1

subterfuge for its real business, which was the recruitment of new Participants and the use of membership fees paid by new Participants to pay the credits "earned" by existing Participants.

The scheme was extensive, complicated, and multi-tiered.  Participants were dispersed throughout the world; eighty percent (80%) were located outside of the United States.  Many Participants had little business sophistication, were recruited by friends or relatives, and spoke a primary language other than English.  Most of the transactions conducted by Participants were triangular in nature, whereby existing Participants were recruited into the scheme and paid their membership fees directly to recruiting Participants who retained the membership fees and used their accumulated credits in existing accounts to satisfy the membership fee due to TelexFree.

The Trustee retrieved and reconstructed the TelexFree written and electronic records that were seized by the federal authorities shortly after the Chapter 11 cases were filed and used these records, along with other investigative tools, to determine the mechanics of the scheme and how transactions were processed and recorded.  After this process was completed, the Trustee filed and obtained approval of a motion establishing that TelexFree had engaged in a Ponzi and pyramid scheme, which became the law of the case.  As part of that same motion, the Trustee sought and obtained a determination by the Court that Participant claims would be calculated based on Net Equity as further described herein.

In consultation with his advisors, the Trustee established a website portal (the "Portal") for Participants to file electronic proofs of claim ("ePOC's" or "Participant Claims").  The ePOC process enabled a Participant to enter personal identifying information used when opening accounts ("User Accounts") to access the TelexFree electronic records in order to complete and file the Participant's claim.

As of September 28, 2017, 132,001 Participant Claims have been filed through the Portal. Of this amount, 112,471 were timely filed and comport with the Debtors' records and the Net Equity formula. The remaining 19,530 Participant Claims consist of 18,835 Claims that were timely filed but do not comport with the Debtors' records and the Net Equity formula and 695 Claims that were filed after the Final Bar Date of March 15, 2017.

The Trustee needs to establish and implement procedures to resolve disputed claims, considering the unique number of claims and the circumstances of these cases. By this motion, the Trustee requests an order authorizing the following provisions with respect to the resolution of Participant Claims:

(i)    Authority for the Trustee to send a Proposed Claim Allowance, as defined herein and in the form attached as Exhibit "A" hereto, to Participants that will propose disallowance of some or all of the Participant's Claims, provide the grounds for disallowance, and provide the Participant an opportunity to file a Claim Response;

(ii)   Authority for the Trustee to file omnibus objections to claims with certain modifications to the parameters set forth for such objections in FRBP and MLBR 3007;

(iii)  Authority to provide electronic notice to Participants with respect to the Proposed Claim Allowance and objections to claims, using the email address provided by the Participants on their Claims;

(iv)   Authority to transmit the Proposed Claim Allowance and objections to claim in English, Portuguese and Spanish;

(v)    Authority for certain Participants who filed a Claim through the Portal using a Standard Claim form (rather than a Participant Claim form) to have a limited

period of time within which to correct the deficiency and to file a Participant

Claim;

(vi)     Authority for the Trustee to close the Portal within forty-five (45) days of

approval of this motion; and

(vii)    An order directing that all Claim Responses transmitted to the Trustee, if not sent

in English, be accompanied by a certified English translation.[1]

Each of these Procedures will facilitate the resolution of Participant claims.  The

implementation of the Proposed Claim Allowance will provide a cost-effective alternative to

resolve certain Participant Claims while minimizing the use of judicial resources.  The

modification of permitted procedures for filing omnibus objections to claims will conserve

resources of the parties and the Court and will further administrative convenience.  The process

will provide necessary due process protections, including notice reasonably calculated to apprise

Participants of the relief requested and an opportunity to respond.  The closure of the Portal will

bring necessary finality to the claims process and preserve estate resources.

In further support of the motion, the Trustee states as follows:

### PROCEDURAL BACKGROUND

1.      On April 13, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") with the

United States Bankruptcy Court for the District of Nevada.

2.      The Debtors initially operated as debtors-in-possession pursuant to Sections 1107

and 1108 of the Bankruptcy Code.

---

[1] As set forth herein, a similar order has been entered for all pleadings filed with the Court.

3.      On the Petition Date, the Debtors filed a motion for joint administration of the cases, with TelexFree, LLC designated as the lead case.  By order dated April 24, 2014, the motion for joint administration was approved.

4.      On May 6, 2014, the Court allowed the motion filed by the Securities and Exchange Commission ("SEC") to change the venue of the cases to the United States Bankruptcy Court for the District of Massachusetts (the "Court").  The cases were transferred to the Court on May 9, 2014.

5.      On May 30, 2014, the Court allowed the motion by the Office of the United States Trustee's to appoint a Chapter 11 trustee, and the Trustee was appointed on June 6, 2014.

6.      The Debtors did not file schedules or statements of financial affairs, nor a matrix of creditors.  The Debtors filed only a list of the alleged thirty (30) largest creditors in the cases. The Trustee submitted schedules and statements of financial affairs on behalf of the Debtors on February 27, 2015 [docket entries 592, 593].

## THE TELEXFREE PONZI SCHEME

7.      The Debtors purported to be operating a multi-level marketing company engaged in the sale of voice over internet protocol ("VoIP") services, but, as set forth above, they were in fact perpetrating a Ponzi and pyramid scheme.  The sale of VoIP was incidental, comprising less than one percent (1%) of total revenues.  The primary business of the Debtors was the recruitment of new Participants to generate revenues for the Debtors and existing Participants.

8.      Participants earned "credits" in their participation in TelexFree by posting electronic advertisements for TelexFree and by recruiting new Participants.  The credits could be redeemed for cash, transferred to another Participant, or applied in payment of an invoice. Participants could purchase a membership or VoIP plan by making payment directly to the

Debtors, or by paying the membership or phone plan fee to a recruiting Participant, who used his/her accumulated credits to satisfy the invoice, in what has been referred to as a "Triangular Transaction".

9.      The TelexFree Ponzi and pyramid scheme was run in concert with a similar scheme based in Brazil by Ympactus, an affiliated entity. TelexFree ensnared as many as 1,000,000 or more Participants, approximately 170,000 of which were based in the United States. The remaining Participants were located in virtually every country throughout the world.

10.      James Merrill and Carlos Wanzeler were the principals of TelexFree and were charged with various violations of the United States criminal code in connection with the implementation of the TelexFree Ponzi and pyramid scheme, in the case styled *United States of America v. James Merrill and Carlos Wanzeler*, case no. 14-CR-40028-TSH (the "Criminal Action") pending in the United States District Court for the District of Massachusetts (the "District Court"). As set forth in the First Superseding Indictment ("Indictment") filed on September 8, 2016 [docket 283], Merrill and Wanzeler were charged with Conspiracy to Commit Wire Fraud (Count One), Wire Fraud (Counts Two to Nine), and Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (Counts Ten through Seventeen). On October 24, 2016, Merrill pled guilty to Counts One through Nine of the Indictment pursuant to a written plea agreement executed on October 24, 2016 [docket 314] and was sentenced to seventy-two (72) months in prison [docket 346]. Wanzeler fled the country and is believed to be in Brazil.

## SOURCES OF FUNDS AVAILABLE FOR DISTRIBUTION

11.    Holders of allowed Participant Claims will be entitled to receive their *pro rata*
distribution of the Forfeited Assets (defined below) and other funds available from those
recovered by the Trustee during the course of the bankruptcy cases.[2]

12.    The Forfeited Assets arise out of the Indictment of the Debtors' principals, the
entry of a guilty plea by Merrill, and the entry of a Restitution Order in District Court.

13.    The Indictment contained a forfeiture allegation, which provided notice that the
United States sought forfeiture, upon conviction of one or more of the offenses charged in
Counts One through Nine, of any property that constituted, or was derived from, proceeds
traceable to the commission of the offenses.  In addition, the Indictment contained a Money
Laundering Forfeiture Allegation, which provided notice that the United States sought forfeiture,
upon conviction of one or more of the offenses alleged in Counts Ten through Seventeen, of any
property, involved in the offenses, and any property traceable to such property.  Pursuant to these
allegations, the United States sought to have certain identified assets forfeited to the government
for distribution to victims of the Ponzi scheme.

14.    As part of the plea agreement, Merrill consented to the forfeiture of the assets
listed as an exhibit to the plea agreement.

15.    On March 16, 2017, the United States submitted its Sentencing Memorandum to
the District Court in the Criminal Action [docket 332].  The Sentencing Memorandum expressed
the intention of the United States to use the pending bankruptcy cases and related claims filing
process to distribute funds to victims, stating that "Pending entry of a final order of forfeiture and

---

[2] As set forth herein, the Forfeited Assets will only be available for distribution to Participants. Other
funds recovered by the Trustee will be available to pay estate expenses including administrative and
priority claims, Participant Claims, and claims of non-Participants. The Trustee reserves all rights with
respect to the order of priority of distribution of funds that are not part of the Forfeited Assets.

7

approval from the Department of Justice pursuant to 21 U.S.C. §853(i), the government

anticipates using all of these assets to compensate victims of the fraud. The government would

distribute the forfeited assets by first transferring the funds to the Chapter 11 trustee ("Trustee"),

under an agreement that the Trustee only use it to compensate victims."

16.    On March 22, 2017, the District Court entered a Preliminary Order of Forfeiture

[docket entry 347] in the Criminal Action. Pursuant to the Preliminary Order, Merrill's interest

in the Forfeited Assets was forfeited to the United States, subject to any claims of third parties.

Pursuant to 21 U.S.C. §853(n)(1), the United States agreed to publish, for thirty (30) consecutive

calendar days, notice of the Preliminary Order and the intent of the United States to dispose of

such assets. Parties, other than Merrill, could petition the District Court to adjudicate an interest

in the Forfeited Assets within sixty (60) days after the first date of publication, or within thirty

(30) days of receipt of actual notice, whichever was earlier.

17.    On June 16, 2017, Fabio Wanzeler filed a Notice of Intent to Contest Forfeiture as

to two residential real properties in Florida [docket 364]. Upon information and belief, the

United States Attorney has granted Carlos Wanzeler and his spouse Katia Wanzeler an extension

of time to respond to the Preliminary Order. No other responses to the Preliminary Order have

been filed. Upon adjudication of all third-party interests, the District Court will enter a Final

Order of Forfeiture in which all interests will be addressed.

18.    On July 11, 2017, the District Court entered a Restitution Order [docket 367]

which provides restitution to victims in coordination with the bankruptcy cases. The Restitution

Order directed that amounts recovered from the Forfeited Assets be paid by the Trustee to Net

Loser Participants who timely filed Claims through the Portal that comport with the Net Equity

ruling of the Court dated January 26, 2016 [docket 687]. The Trustee was directed to make the

distributions to Participants on a *pro rata* basis, without offset for administrative cost or other expenses.

19.    The amount of Forfeited Assets potentially available for turnover to the Trustee, subject to resolution of competing claims, is in excess of $100,000,000.   The Forfeited Assets include cash, and real property and tangible personal property that will need to be monetized prior to distribution to Participants.

20.    The Trustee has approximately $20,700,000 on hand.  The Trustee also has certain judgments and two pending class actions against Net Winners that may result in additional recoveries.

## RECONSTRUCTION OF THE DEBTORS' BOOKS AND RECORDS

21.    Upon his appointment, the Trustee had no access to the Debtors' books and records, because they had been seized by federal authorities, primarily Homeland Security Investigations ("HSI").   Neither of the Debtors' principals has been available.   While certain of the Debtors' employees provided some assistance to the Trustee, others were either unavailable or unwilling to cooperate.

22.    The Trustee obtained a copy of the Debtors' books and records from HSI and underwent an extensive recovery process to make the records usable, particularly the so-called "SIG" system that housed the activity for Participant transactions.

23.    Most of the Debtors' records were kept electronically.  The Debtors' computer system consisted of forty-six (46) computers and servers containing more than 20 terabytes of data.  The Trustee did not have any copies of the Debtors' electronic records.  HSI provided copies of the Debtors' computers and servers to the Trustee beginning in August 2014.  Once a copy of the Debtors' computers and servers was provided to the Trustee, the Trustee and his

advisors performed the following tasks in order to make the information on the Debtors'
computer system usable:

(i)    Located the key database server containing the bulk of the Debtors' operational
and Participant activity;

(ii)    Determined the proper configuration of the Debtors' servers, so that the servers
could interface with one another;

(iii)    Converted the data obtained from the Debtors' servers into "virtual servers"
maintained by the Trustee's agents;

(iv)    Determined the other essential computers and servers needed to obtain necessary
information respecting the Debtors' operations and Participant activity; and

(v)    Developed an understanding of the Debtors' database structure, including data
fields and process flow.

24.    The Trustee determined from these efforts that the Debtors maintained two
separate applications for accessing its databases of Participant activity – SIG, which was used by
the Debtors' personnel, and the Back Office, which was used by Participants.

25.    SIG was the web browser based front-end application used by the Debtors'
personnel to access the Debtors' database to obtain reports on and administer Participant activity.

26.    Each time that a Participant purchased a membership plan or VoIP plan, an
account was established with SIG (a "User Account").

27.    When opening a User Account, Participants were prompted to provide a series of
personal identifying data, including name, physical address, email address, home phone, cell
phone, and passcode.

28.    After a User Account was established, SIG tracked the activity of the Participant in that User Account, including the accumulation of credits for bonuses and commissions "earned", the use or transfer of credits between User Accounts, and payments made to or from the Participant directly with the Debtors.

29.    SIG does not provide a mechanism for linking all of a Participant's User Accounts. Because of the absence of a mechanism to automatically link accounts for an individual Participant, the Trustee and his advisors had to develop a method for aggregating a Participant's User Accounts.

30.    The Back Office is a web browser-based front-end application used by Participants to access the Debtors' database, and was the primary way in which Participants interacted with the Debtors. For example, Participants logged onto the Back Office to obtain information on their accounts, such as account balances and the identification and status of the Participants within their multi-level "tree", to create new accounts, to request payment, and to transfer credits among accounts.

### I.    Ponzi Finding and Net Equity Determination

31.    After reconstructing the Debtors' books and records and conducting other due diligence, the Trustee concluded, in consultation with his advisors and governmental authorities, that TelexFree had been operating as a Ponzi and pyramid scheme. Participants were promised astronomical returns for placing meaningless advertisements on the internet, and these returns were satisfied by fees paid by new recruits. Participants were able to effectively recruit themselves by opening additional User Accounts. There was no legitimate product other than the sale of VoIP plans which constituted less than one percent (1%) of total revenues; in

11

addition, less than one percent (1%) of the minutes available for usage on VoIP plans sold were ever used.

32.     On October 7, 2015, the Trustee filed his *Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief* (the "Ponzi Motion").  By order dated November 25, 2015, as amended on December 21, 2015, the Court found the Debtors to have engaged in a Ponzi and pyramid scheme and that this finding was the law of the case.

33.     As part of the Ponzi Motion, the Trustee requested a finding that, because the Debtors were operating a Ponzi and pyramid scheme, claims for accumulated credits should be disallowed and the claims of individuals who lost money from participating in the Debtor's Ponzi and pyramid scheme ("Participants") should be determined using the "Net Equity" formula (as described below).  By supplemental order dated January 26, 2016, the Court approved the Net Equity formula for determining the allowed claims of Participants.

34.     The Net Equity formula provided for the following:

(i)     in determining the amount of a Participant's claim, any claim or portion of claim based upon accumulated credits in a Participant's User Accounts as of the Petition Date shall be disallowed;

(ii)    Participant Claims shall be computed as follows: the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less amounts received by the Participant from the Debtors' scheme, including amounts received pursuant to Triangular Transactions;

(iii)     In determining the amount of a claim of a Participant who has more than one User

Account, the activity in all of the Participant's User Accounts shall be aggregated

and netted against one another.

**II.     Development of the Portal and Claims Filing Process**

35.     Having established the methodology of the Net Equity method for determining

Participant's allowed claims, the Trustee needed to then establish a method for Participants to

file claims.

36.     In the initial stages of these cases, Participants filed claims both with the Court

and with the Trustee's claims agent, Kurtzman Carson Consultants ("KCC").  Claims or victim

notification forms were also filed with the Federal Bureau of Investigation and the Massachusetts

Secretary of State.  It was apparent from an initial review that these claims were deficient in

numerous respects.  The claims asserted wildly diverging amounts, often asserting claims for

accumulated credits, punitive damages, and other claims not allowable in accordance with the

Net Equity formula.  The claims were largely handwritten, and often did not clearly identify the

User Accounts claimed by the Participant or provide sufficient information to identify the

Participant's User Accounts.  It became evident that these claims would have to be reconciled

with the Debtors' records on a painstaking claim-by-claim basis.  Because there were upwards of

one million Participants and more than one billion Participant transactions, a manual

reconciliation of all claims could potentially have consumed all of the resources of the case.

37.     The Trustee determined that he needed to establish a system that would enable

him to confirm the accuracy of Participant claims filed against the Debtors' records and the Net

Equity formula.  In order to address these issues, an electronic claim filing process needed to be

established that would enable Participants to access the Debtors' records and provide Participants

with an opportunity to confirm or deny Net Equity activity as reflected in the Debtors' records, or to make other adjustments.

38.     On October 7, 2015, the Trustee filed his *Motion by Chapter 11 Trustee for Entry of Order Fixing Bar Date for Filing Proofs of Claim, Approving Form and Manner of Providing Notice, Directing that Claims Be Filed Electronically, and Approving Content of Electronic Proofs of Claim* (the "Claims Motion").   Pursuant to the Claims Motion, the Trustee sought to establish an electronic process for the filing of claims by Participants that would supersede the various types of claims that had been earlier submitted in multiple fora.

39.     On January 26, 2016, the Court entered an order approving the Claims Motion (the "Claims Order").  The Claims Order provided for a bar date of not less than ninety (90) days after the Portal became operational and notice of the bar date had been served.  The Claims Order approved the form and manner of notice of the bar date, including electronic mail notice to all known Participants in English, Spanish and Portuguese, and constructive notice through certain multi-level marketing websites. The Claims Order further directed Participants to file claims using the Participant Claim form and for all other claimants to use the Standard Claim form.

40.     The Claims Order provides that the submission of an ePOC:

> shall be the sole and exclusive method of filing claims in these cases.  Any claims previously filed or hereinafter filed that do not comply with the ePOC process set forth herein shall be disallowed without further order of the Court, including any proofs of claim previously filed with KCC or the Court and any victim notification forms submitted to the FBI or the Massachusetts Secretary of State.  Participants and other claimants are instructed not to file any proofs of claim with the Bankruptcy Court or with KCC. [Docket entry 688, ¶15].

41.     Upon entering the Portal, Participants were provided an opportunity to input all personally identifiable information that was used in opening User Accounts with TelexFree,

including name, User Account number, address and phone information and passcodes. This information was then matched against the Debtors' records to identify User Accounts attributable to the Participant.

42.     Participants then had an opportunity to accept or reject any User Account that was ascribed to them.

43.     After the User Account identification process was completed, Participants were provided the detailed transaction activity associated with each User Account, including both direct transactions with TelexFree and Triangular Transactions. The ePOC aggregated the transaction activity in all of the User Accounts to arrive at a proposed claim amount. The Participant could then add, delete, or modify transactions and provide supporting documentation for any changes made. The Claim was then submitted.

44.     On May 27, 2016, after the Portal became operational, the Trustee filed a *Notice of Deadline for Filing Electronic Proofs of Claim and Claims Procedures* (the "Bar Date Notice"). The Bar Date Notice established an initial bar date of September 26, 2016 (the "First Bar Date") for the filing of electronic claims and was served in accordance with the provisions of the Claims Order.

45.     On or about September 21, 2016, the Trustee filed a motion to extend the deadline set forth in the First Bar Date to December 31, 2016 (the "Second Bar Date"). This motion was granted by order dated September 23, 2016, and notice of the Second Bar Date was served in accordance with the terms of the Claims Order.

46.     In light of the wide publicity emanating from Merrill's anticipated entry of a guilty plea, on or about December 8, 2016, the Trustee filed a second motion to extend the deadline for filing an ePOC to March 15, 2017 [docket entry 827, the "Final Bar Date"]. This

Case 14-40987    Doc 921    Filed 10/16/17    Entered 10/16/17 14:59:32    Desc Main
Document    Page 16 of 28

motion was granted by order dated December 21, 2016 and notice of the Final Bar Date was

served in accordance with the terms of the Claims Order.

### III.    Issues with Participant Claims

47.    As set forth above, 132,001 Participant Claims have been filed through September

28, 2017, including 131,306 that were timely filed and 695 that were filed after the Final Bar

Date.

48.    The Participant Claims incorporate transactions with the Debtors reflected in

1,825,687 User Accounts.  In approximately eighty-five percent (85%) of instances, the amounts

asserted in each User Account within a Participant's Claim comport with the Debtors' records

and the Net Equity formula.  The timely filed Participant Claims that do not appear to conform

with the Net Equity formula raise one or more of the following issues:

(i)      Multiple Participants claimed ownership of one or more of the same User
         Accounts;

(ii)     Participants deleted User Accounts associated with them by the Debtors' records
         without adequate explanation or documentation;

(iii)    Participants added User Accounts that were not associated with them by the
         Debtors' records without adequate explanation or documentation;

(iv)     Participants added or deleted a transaction or adjusted a transaction amount in a
         User Account without adequate explanation or documentation;

(v)      Participants adjusted the amount of their claim based on transactions not
         consistent with the Net Equity formula, without adequate explanation or
         documentation; and

(vi)     Participants asserted claims in foreign currencies or asserted punitive claims or

other claims not allowable under the Net Equity formulation approved by the

Court.

49.     In addition to the foregoing issues that are unique to these cases, many other

claims may be objectionable for reasons that typically arise in an omnibus claim objection, such

as claims that are late filed, duplicative, or have been amended.

## RELIEF REQUESTED

50.     In order to resolve the claims related issues, the Trustee has proposed a dual

process consisting of the Proposed Claims Allowance and omnibus objections to claims.  The

Trustee has proposed to serve these documents on Participants using email addresses provided in

Participant Claims in order to mitigate costs, expedite the transmittal process, and provide

greater assurance of proper notice.  The Trustee requests authority to close the Portal in order to

bring finality to the claims review process, but only after providing Participants who filed their

Claim using a Standard Claim form an opportunity to do so using the form specially designed for

Participants.

**I.     Proposed Claim Allowance**

51.     In an effort to reduce the number of claims requiring adjudication by the Court,

the Trustee requests authority to send Participants a Proposed Claim Allowance.

52.     The Proposed Claim Allowance will do the following:

(i)     advise the Participant of the Trustee's assertion that the Claim is not in

compliance with the Net Equity formula, identify one or more grounds for the

objection, request additional explanation or documentation, and propose an

allowed claim amount for that Participant;

17

(ii)    provide Participants with thirty (30) days to submit a Claim Response;

(iii)    provide that if a Participant fails to submit a timely Claim Response, the Trustee shall be authorized to file a Notice of Claim Allowance ("Notice"), in the form attached as Exhibit "B" hereto, that will constitute the Participant's allowed claim, unless the Participant files a response within fourteen (14) days and demonstrates good cause for failure to timely respond to the Proposed Claim Allowance;

(iv)    provide that if a Participant files a timely Claim Response to the Proposed Claim Allowance and the Trustee is unable to resolve the claim dispute with the Participant, the Trustee may file an objection to the claim with the Court, which shall comport with the omnibus claims procedures set forth below;

(v)    provide that if a Participant files a timely Claim Response to the Proposed Claim Allowance and the Trustee is able to reach a consensual resolution of the claim with the affected Participant, the Trustee will file with the Court an Affidavit of Claim Allowance (an "Affidavit"), in the form attached as Exhibit "C" hereto, which shall establish the allowed amount of the claim without further notice or order.

53.    The Proposed Claim Allowance, Notice, and Affidavit are designed to streamline the resolution of claims and minimize the burden upon the Court.

54.    The modified procedures are appropriate under the circumstances. *See, e.g., In re MF Global, Inc., Case No. 11-2790 (MG) SIPA,* (Bankr. S.D.N.Y. November 23, 2011, docket entry 423)(Trustee authorized to compromise and settle customer claims without further order of

the Court); *see also* FRBP 2002(a)(3)(court may direct that for cause shown notice of a hearing on approval of a compromise or settlement of a controversy not be sent).

## II.    Omnibus Objections to Claims.

55.    In those instances where a Proposed Claim Allowance is not practicable and/or does not result in claim resolution, the Trustee further requests authority at any time to submit omnibus objections to Participant claims, subject to the modified procedures set forth below (the "FRBP 3007 Modifications").

56.    FRBP 3007 limits the types of claims objections that an estate representative may assert against multiple claimants on an omnibus basis.  FRBP 3007(c) provides that "unless otherwise ordered by the court or permitted by subdivision (d), objections to more than one claim shall not be joined in a single objection."  FRBP 3007(d) permits omnibus objections only when the basis for each objection fall into one of the following categories:

(i)    The claims are duplicative;

(ii)    The claims are filed in the wrong case;

(iii)    The claims have been amended;

(iv)    The claims were not timely filed;

(v)    The claims have been satisfied or released during the case in accordance with the Bankruptcy Code, the applicable rules, or a court order;

(vi)    The claims were presented in a form that does not comply with applicable rules, and the objector is unable to determine the validity of the claim because of the noncompliance;

(vii)    The claims are interests, rather than claims; or

(viii)   The claims assert priority in an amount that exceeds the maximum amount

permitted under Section 507 of the Bankruptcy Code.

57.    In addition to the list of common objections set forth in FRBP 3007(d), the

Trustee requests authorization to include within omnibus objections that the Claim does not

comport with the Net Equity calculation for one or more of the following reasons:

(i)    Multiple Participants claimed ownership of one or more of the same User

Accounts;

(ii)   Participants deleted User Accounts associated with them by the Debtors' records

without adequate explanation or documentation;

(iii)  Participants added User Accounts that were not associated with them by the

Debtors' records without adequate explanation or documentation;

(iv)   Participants added or deleted a transaction or adjusted a transaction amount in a

User Account without adequate explanation or documentation;

(v)    Participants adjusted the amount of their claim based on transactions not

consistent with the Net Equity formula, without adequate explanation or

documentation;

(vi)   Participants asserted claims in foreign currencies or asserted punitive claims or

other claims that do not qualify for allowance under the Net Equity formulation

approved by the Court; and

(vii)  The claims are objectionable under Sections 502(d) of the Bankruptcy Code.

58.    If the Trustee were required to file individual objections to Participant claims on

the foregoing grounds, the Trustee could be required to file hundreds, or thousands, of largely

duplicative objections which would cause confusion, unnecessarily burden the Court, and

increase the expense to the Estates. The Trustee therefore requests authority to include the foregoing as additional grounds for objection to Participant claims through the omnibus objection process.

59.    FRBP 3007(e) provides requirements for the formatting of omnibus objections to claims, including the requirement that claimants be listed alphabetically and that objections be limited to 100 claims. Mass. Local Bankruptcy Rule 3007 contains a similar limitation of 100 objections per omnibus claim. The Trustee requests authority to modify these provisions in two respects.

60.    First, the Trustee requests authority to categorize Participants claims based upon the Participant's country of origin. Because TelexFree was structured in a pyramid fashion, many Participants were recruited into the scheme by other Participants. Based upon anecdotal data gleaned from discussions with Participants, the Trustee believes that many Participants were drawn into the scheme by friends, family members, or co-workers. The Ponzi scheme expanded throughout the world, operating in more than 100 countries. Many Participants were likely recruited by other Participants in their county and may have been assisted in filing claims by such persons. For these reasons, categorizing claim objections by country may ease the burden to Participants of responding to objections to claims and may facilitate the resolution of claim disputes.

61.    Second, the Trustee requests that the minimum number of Participant claims permitted in each omnibus objection be increased to 250. Given the potential for thousands of objections, increasing the minimum number of claims addressed in each objection should further judicial economy and ease administrative burdens.

62.    Courts have approved similar modifications to the provisions of FRBP 3007 when shown to be appropriate. *See, e.g., In re Alpha Natural Resources, Inc. et al,* Case No. 15-33896 (Bankr. E.D. Va. May 3, 2016, docket entry 2303)(authorizing assertion of omnibus objections on additional grounds not included within FRBP 3007 and authorizing inclusion of up to 500 claims in any single omnibus objection and customization of notices to claimants); *see also In re Global Aviation Holdings, Inc. et al, Case No. 12-40783 (CEC)* (Bankr. E.D.N.Y. November 20, 2012, docket entry 752)(authorizing assertion of omnibus objections on additional grounds and authorizing objections in excess of 100 claims); *In re MSR Resort Golf Course, LLC, Case No. 11-10372* (Bankr. S.D.N.Y. September 17, 2012).

### III.    Electronic Noticing

63.    The Trustee requests authority to serve the Proposed Claims Allowance and objections to claims on Participants by electronic mail using the email address provided by Participants in their Claim.

64.    The Court previously authorized the Trustee to notify Participants electronically of the bar date for filing claims and required claims to be submitted electronically because of, among other things, the size and scope of the TelexFree Ponzi and pyramid scheme, the number of Participants, and their geographical dispersion. These same factors support the electronic noticing proposed by the Trustee herein.

65.    Each of the Participants was required to provide an electronic mail address when completing a Claim. The Trustee requests authority to communicate with Participants exclusively through this email address during the claims resolution process, including the issuance of Proposed Claim Allowance, Notice, and Affidavit, and the filing of omnibus objections to claims.

66.    Electronic notice to Participants via the email address provided in the Claim will provide the best assurance that notice is received, will expedite the delivery of documents to and from Participants and thereby accelerate the claims determination process, and will yield substantive savings to the Estates over the costs of providing physical notice to thousands of Participants, many of whom are located overseas.

67.    The electronic noticing procedures proposed by the Trustee satisfy due process considerations. Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." In re Arch Wireless, Inc., 534 F.3d 76 (1st Cir. 2008).

68.    Bankruptcy courts have authorized notice via electronic mail where appropriate under the circumstances. See In re Natural Products Group, LLC, case no. 10-10239-BLS (Bankr. D. Del. 2010)(court authorized service of pleadings and notices electronically upon approximately 2,000,000 independent consultants in multi-level marketing case); In re VarTec Telecom, Inc., case no. 04-81694-SAF-11 (Bankr. N.D. Tex. 2004)(authorization to serve pleadings electronically on 130,000 independent representatives in multi-level marketing business). Similarly, electronic notice has been found to comport with requirements of due process in many federal, nonbankruptcy cases. See, e.g., Securities and Exchange Commission v. Rex Venture Group, LLC, d/b/a ZeekRewards.com and Paul Burks, case no. 3:12-cv-519 (W.D.N.C. 2013)(court authorized electronic notice of bar date and proposed claim resolution to participants in multi-level pyramid scheme); Browning v. Yahoo Inc., 2007 WL 4105971 (N.D. Cal. Dec. 27, 2006) (finding that electronic mail notice and publication notice was adequate for

members of a class in a class action settlement); *Rio Properties, Inc. v. Rio Int'l Interlink*, 284

F.3d 1007, 1016 (9th Cir. 2002) (finding service of a complaint via electronic mail valid); *RPost*

*Holdings, Inc. v. Kagan,* 2012 WL 194388, at \*2 (E.D.Tex. Jan. 23, 2012) (electronic notice of

complaint authorized); *Liberty Media Holdings, LLC v. Vinigay.com*, 2011 WL 810250, at 2-5

(D. Ariz. Mar.3, 2011) (same).

69.     The Trustee seeks authority to provide customized notices to Participants, in lieu

of attaching complete exhibits to an omnibus objection, where the use of such customized

notices will, in the Trustee's judgment, provide superior notice to Participants and/or cost

savings to the Debtors' estates.

IV.    **Multilingual service of Proposed Claim Allowance and objections to claim.**

70.     As set forth above, the Claims Order directed that the Bar Date Notices be served

on Participants in English, Spanish, and Portuguese, the predominant native languages of

Participants.  The Trustee requests entry of a similar order for implementation of the Procedures,

specifically, that the Proposed Claim Allowance and omnibus objections to claims be served

upon Participants in English, Spanish, and Portuguese.

V.    **Resolution of Participant Claims Filed Using Standard Claim Form.**

71.     The Trustee requests authority to provide Participants who filed a Standard Claim

thirty (30) days to correct this deficiency and file a Participant Claim.

72.     As discussed above, the Portal provided Participants with an opportunity to

interface with the Debtors' records in filing their Participant Claim by inputting personally

identifiable information used in establishing User Accounts. The bar date notices that were sent

to Participants on multiple occasions stated that the Participant ePOC was the exclusive method

for a Participant to file a claim.

73.    The Portal also provided an opportunity for creditors other than Participants to file a Standard Claim form electronically.  Some Participants, incorrectly, filed a Standard Claim rather than a Participant Claim.  The Standard Claim does not require a creditor to input identifying data that a Participant would have used when they were involved in the TelexFree program.  Participants who filed a Standard Claim were therefore not given an opportunity to examine activity attributed to them by SIG and to accept or reject the information set forth therein.  Participant claims incorrectly filed using a Standard Claim form are much more likely to contain inadequate information to reconcile against the Debtors' records.

74.    Approximately 3,400 claimants filed Standard Claims and consist of claims filed by creditors who were not Participants, as well as Participants who submitted the incorrect ePOC form.

75.    The Trustee proposes to issue a Notice to the affected Participants, substantially in the form appended as Exhibit "D" hereto, allowing such Participants a period of thirty (30) days in which to file a Participant Claim, failing which the Participant's claim will be disallowed without further Court order.

VI.    **Closure of the Portal**

76.    The Trustee requests authority to close the Portal to avoid the necessity of continued review for late filed claims.

77.    The bar date, as extended, expired on March 15, 2017.  Notwithstanding the expiration of time to file claims, the Portal has heretofore remained open to allow Participants to file late claims.  The Trustee continues to incur costs in maintaining the Portal and in reviewing late claims filed.

78.     The Trustee requests authority to terminate access to the Portal no earlier than forty-five (45) days after approval of this motion.  This delay will allow Participants who erroneously filed a Standard Claim form with an opportunity to file a corrective Participant Claim.  The closure of the Portal will allow the Trustee to conduct one final review of late claims and to file appropriate objections.  If a Participant believes that they have a basis for filing a late claim after the closure of the Portal, their remedy will be to petition the Court for authority to file such a claim and to demonstrate excusable neglect under the applicable standards in this jurisdiction.

### VII.     Responses in English

79.     Victims of TelexFree registered with upwards of 200 country codes (some countries have two or more country codes) in every region of the world, and Participants have numerous native languages.  On or about May 10, 2016, the Court entered an order directing that all pleadings or documents that are not in the English language and which are presented or filed in the case, or associated adversary proceedings, be accompanied by a certified translation into English prepared by an interpreter certified by the Administrative Office of the United States Courts [see docket entry 741].

80.     The Trustee requests that this order extend to any responses to the Proposed Claim Allowance sent by Participants to the Trustee to reduce cost to the estate and avoid unnecessary delays.

### VIII.     Use of Participant Name

81.     Certain Participants did not identify their name in the "Name" column of the Participant Claim, but may have identified themselves in the "Signature" column.  Other

Participants identified themselves with symbols other than the Latin alphabet, such as Chinese or Russian characters.

82.     In connection with sending Proposed Claims Allowances and omnibus objections to claims, the Trustee requests that the order provide that if a Participant did not identify their name in the "Name" column of their Claim, the Trustee may use the name indicated in the "Signature" column of the Claim form for identification purposes. The Trustee further requests that if a Participant listed a name in a format other than the Latin alphabet, the Trustee may rely solely upon the Participant Claim number in communications with Participants and filings with the Court.

## AUTHORITY UNDER SECTION 105

83.     Section 105 of the Bankruptcy Code provides the Court with the authority to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. Section 105 provides supplemental authority for the Court to make necessary modifications to procedures to best administer these cases. *See Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992)(allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of equitable powers).

84.     The unique nature of these cases, including the number of Participants, their geographical dispersion and level of business sophistication, and the complicated manner in which the scheme was implemented, calls for a specially tailored claims process to resolve claims disputes in a timely and efficient manner while minimizing the administrative costs and inconvenience to the Court. If the claims filing and objection process were to be administered under conventional practice and procedure, the costs of that process could consume a substantial portion of the recovery available for Participants and significantly inconvenience the Court.

85.     Good cause exists for the requested relief.

Wherefore, the Trustee prays that this Court:

1.     Enter an order in the form attached hereto as Exhibit "E" approving the proposed

Procedures; and

2.     Grant such other relief as is just and proper.

STEPHEN B. DARR, CHAPTER 11 TRUSTEE,
By his attorneys,

Harold B. Murphy (BBO #362610)
Andrew G. Lizotte (BBO #559609)
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA 02108
Telephone: (617) 423-0400
Facsimile: (617) 423-0498
Email: ALizotte@murphyking.com

Dated: October 16, 2017
732657