B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>Stephen B. Darr as he is the Trustee of the Chapter 11 Estates of Each of the Debtors | **DEFENDANTS**<br>David E. Hackett, Linda Hackett<br>and<br>Darla Mae Massad, Trustee of D & L Realty Trust |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Murphy & King, Professional Corporation<br>One Beacon Street, Boston, MA 02108<br>Attn: Charles R. Bennett, Jr., Exq.     (617) 423-0400 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Avoidance of fraudulent transfers.

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et. seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 580,574.00 |

**Other Relief Sought**

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES ||||
|---|---|---|---|
| NAME OF DEBTOR TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc. ||  BANKRUPTCY CASE NO. 14-40987-MSH, 14-40988-MSH, and 14-40989-MSH (Jointly Administered) ||
| DISTRICT IN WHICH CASE IS PENDING Massachusetts || DIVISION OFFICE Eastern Division | NAME OF JUDGE Melvin S. Hoffman |
| RELATED ADVERSARY PROCEEDING (IF ANY) ||||
| PLAINTIFF | DEFENDANT || ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING || DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) [signature] ||||
| DATE February 7, 2020 || PRINT NAME OF ATTORNEY (OR PLAINTIFF) Charles R. Bennett, Jr., Esq. ||

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>    Debtors. | Chapter 11 Cases<br><br>14-40987-MSH<br>14-40988-MSH<br>14-40989-MSH<br><br>Jointly Administered |
| STEPHEN B. DARR AS HE IS THE TRUSTEE OF THE CHAPTER 11 ESTATES OF EACH OF THE DEBTORS,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID E. HACKETT, LINDA HACKETT AND<br>DARLA MAE MASSAD, TRUSTEE OF D & L REALTY TRUST,<br><br>    Defendants. | Adversary Proceeding No. |

## COMPLAINT WITH REQUEST FOR INJUNCTIVE RELIEF

### INTRODUCTION

The Defendants David E. Hackett and Linda Hackett are Net Winners and defendants in the Net Winner Class Action ("**Class Action**"), an Adversary Proceeding commenced by the Trustee on January 15, 2016, styled *Stephen B. Darr as He Is Trustee of the Chapter 11 Estates of Each of the Debtors v. Benjamin Argueta*, Adversary Proceeding No. 16-04006. The Trustee has received information that would indicate that shortly after the commencement of the Class Action, the Hacketts fraudulently conveyed assets with the actual intent to hinder and delay the

1

769735

Trustee from satisfying the Judgment he was likely to obtain against the Hacketts in the Class Action.

The Trustee, therefore, brings this action to avoid those transfers and preserve those assets pending a final resolution of the Class Action.

The Trustee also seeks an injunction to enjoin and restrain the Hacketts and anyone acting in active concert with them, including Darla Mae Massad as she is Trustee of the D&L Realty Trust, from conveying, encumbering, or in any way diminishing the value of the assets or the Hacketts' interest therein.

## PARTIES

1. On June 6, 2014, the Plaintiff Stephen Darr was duly appointed Trustee of the Estates of the Debtors. The Trustee has a principal place of business in Boston, Massachusetts.

2. The Defendants, David E. Hackett and Linda Hackett are husband and wife who reside at 1 Eastbrooke Circle, Madison, MS 39110 (the "**Hacketts**").

3. The Defendant, Darla Mae Massad, is an individual who is the Trustee of the D&L Realty Trust. She resides at 194 Weatherbee Drive, Westwood, MA 02090 ("**Massad**").

4. TelexFree, Inc. is a Massachusetts corporation that had its principal place of business in Marlborough, Massachusetts. Prior to February 2012, it was known as Common Cents Communications, Inc., which was incorporated by James Merrill ("**Merrill**"), Carlos Wanzeler ("**Wanzeler**") and Steven Labriola in 2002.

5. TelexFree, LLC is a Nevada limited liability company with its principal place of business at the same address in Marlborough as TelexFree, Inc. It was formed by Merrill, Wanzeler and Carlos Costa (a resident of Brazil) in July 2012, and it registered to do business in Massachusetts in April 2013.

769735

6. TelexFree Financial, Inc. is a corporation duly organized under the laws of the State of Florida and having a principal place of business in Marlborough as the other Debtors.

7. On April 13, 2014, the Debtors filed for bankruptcy under Chapter 11 with the United States Bankruptcy Court for the District of Nevada. The cases were transferred to this Court by Order dated May 23, 2014.

## JURISDICTION

8. This adversary proceeding is brought pursuant to §§ 544, 548, 550 and 551 of Title 11 of the United States Code for the avoidance and recovery of fraudulent conveyances.

9. This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, this adversary proceeding being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

10. Venue in this district is proper under 28 U.S.C. § 1409.

## FACTUAL ALLEGATIONS

11. The Debtors operated a massive Ponzi and pyramid scheme, which involved as many as 1,900,000 participants ("**Participants**") from multiple countries under the guise of a "multi-level marketing" company with its headquarters in Marlborough, Massachusetts. The Debtors represented themselves as being in the business of selling telephone service plans that use "voice over Internet" ("**VoIP**") technology. However, the sale of VoIP constituted only a minor portion of their business; the Debtors' actual business was the recruitment of Participants.

12. From April 2012 to April 2014, individuals throughout the world purchased membership plans with a transaction value of approximately $3,000,000,000. The memberships promised substantial returns – 200% per year or more – for becoming "promoters" of the

3

769735

business. The Debtors promised to pay Participants for placing ads on the internet and recruiting other Participants to do the same.

13. The basic features of the Debtors' membership program had all the hallmarks of a Ponzi and pyramid scheme: (1) Participants were promised unusually high returns – over 200% per year evidenced by redeemable credits – for posting internet ads; (2) Participants were promised bonuses if they recruited new Participants, who would recruit new Participants (and so on and so on); and (3) while there were some VoIP plans sold, Participants did not have to sell the plans in order to receive redeemable credits. Because Participants were strongly encouraged to recruit new Participants and were not required to sell the VoIP plans, the Debtors were using funds from later Participants to pay earlier Participants. The membership fees from Participants constituted more than ninety-nine percent (99%) of the monies taken in by the Debtors.

14. The revenues from retail VoIP sales were only a tiny fraction of the money the Debtors promised to pay to Participants. Credit card and banking transactions indicate that, from August 2012 to March 2014, the Debtors received approximately $6,600,000 from the retail sale of monthly VoIP contracts. During the same period, the Debtors received more than $340,000,000 from Participants who purchased membership plans. Through the sale of those one-year contracts, the Debtors effectively promised to pay more than $5,000,000,000 to the Participants on account of the guaranteed return for posting internet advertisements. In other words, the revenues from retail VoIP sales covered barely 0.1% of the Debtors' obligations to pay Participants for placing advertisements, without taking into account obligations to pay Participants the commissions associated with recruiting other Participants. As a result, the Debtors paid earlier Participants not with revenues from selling the VoIP services but with money received from later Participants.

15. On November 25, 2015, the Court, on motion by the Trustee and after notice and hearing, entered an Order, as amended on December 21, 2015, finding that the Debtors were engaged in a Ponzi scheme and that this ruling was the law of the case in each of the jointly administered cases.

### User Accounts

16. Each time that a Participant purchased a membership plan or VoIP Package, the Participant established an account with the Debtors (the "**User Account**") that recorded the Participant's transactions with the Debtors, including payments of invoices, accumulation of credits, bonuses, and commissions, use of credits to satisfy invoices, and cash receipts.

17. At the time a User Account was established, the Participant was directed to provide his/her name, address, email address, phone numbers, passcodes, and other identifying information (the "**Common Identifiers**").

18. A Participant could establish more than one User Account and, in practice, many Participants had multiple User Accounts.

19. The User Accounts tracked credits issued to Participants for placing advertisements, selling membership plans and VoIP Packages, and the activities of certain other affiliated Participants. These credits could be redeemed by a Participant for cash, transferred by a Participant to another User Account, or applied by a Participant in satisfaction of an invoice for another User Account in exchange for cash payment from a recruited Participant.

### Types of Transaction

20. Invoices issued by the Debtors to Participants for the purchase of a membership plan could be satisfied in one of two ways. Participants could satisfy the invoice by payment in cash to the Debtors, or Participants could use their accumulated credits in one User Account to

5

769735

satisfy an invoice for a membership plan sold to a new User Account, for themselves or for another Participant.

21. In the case of a Participant satisfying his/her own invoice by payment in cash to the Debtors, the process worked, generally, as follows:

(i) The Participant established an online account;

(ii) The Debtors' database recorded the data entered by the new Participant and the identity of the recruiting Participant, and assigned an identification number to the new User Account;

(iii) The Debtors recorded the purchase, issued a numbered invoice, and marked the invoice as 'pending';

(iv) A Participant could pay the invoice by cash, check, cashier's check, wire transfer, or through a third-party online payment processing account. When the invoice was paid, the Debtors would update the invoice;

(v) The new Participant could then start building a pyramid underneath the newly created User Account by recruiting other members (or by purchasing new User Accounts themselves) and generating bonuses and commissions.
[referred to as a "**Direct Transaction**"]

22. A Participant could monetize accumulated credits by recruiting a new Participant using his/her accumulated credits to satisfy the invoice issued by the Debtors to the new Participant for the purchase of a membership plan, and the new Participant paid the membership fee to the recruiting member, rather than to the Debtors (hereinafter a "**Triangular Transaction**").

23. In the case of a new User Account being opened with the use of accumulated credits in another User Account, the process worked, generally, as follows:

(i) A Participant created his/her online account, or used their existing account information, to establish a new User Account;

(ii) The Debtors' database recorded the details entered by the new Participant and assigned an identification number to the new User Account;

6

769735

(iii)  The Debtors recorded the purchase, issued an invoice to the new User Account, and marked the invoice as 'pending';

(iv)  The new Participant forwarded the invoice to the recruiting Participant, who satisfied the invoice with accumulated credits in the existing User Account;

(v)  The new Participant paid the invoice amount to the recruiting Participant (in those cases where there were two separate Participants involved).

24.  The substantive result of the Triangular Transaction is that funds otherwise payable to the Debtors from Participants for the purchase of membership plans were paid to the recruiting Participants, who in turn satisfied the invoice issued by the Debtors to the new Participant by reducing the recruiting Participant's accumulated credits.

25.  Participants had multiple User Accounts, which can be identified to the Participant by, among other means, Common Identifiers. These multiple User Accounts of a Participant are hereinafter referred to as "**Related User Accounts**."

26.  The Trustee has determined the Net Winners by aggregating Related User Accounts to include money paid to the Debtors, received from the Debtors, and money paid to and received from other Participants in connection with the purchase or membership plans and VoIP Packages.

27.  The Hacketts engaged with the Debtors. On an aggregate basis, the Hacketts made direct payments to the Debtors in the amount of $574,742 under various User Accounts, all attributable to the Hacketts. The Hacketts redeemed credits or otherwise received direct payments from the Debtors in the amount of $1,178,647, resulting in net Direct Payments to the Hacketts of $603,905.

28.  The Hacketts also engaged in Triangular Transactions, pursuant to which they made aggregate payments in the amount of $1,348,580 and received payments from third parties

7

769735

in connection with Triangular Transactions of $1,581,111, resulting in Net Winnings as a result of Triangular Transactions of $232,531.

29. In addition to the Direct and Triangular Transactions, the Hacketts also purchased credits from the Debtors in an aggregate amount of $255,862. As a result, after aggregating their Net Winnings and crediting the credit purchases, the Hacketts were Net Winners in the aggregate amount of $580,574. A detailed accounting of the Hacketts' account is annexed hereto as **Exhibit A**.

30. At the time that the Trustee commenced the Class Action and advised the Hacketts of their liability, the Hacketts were the sole beneficiaries of the D&L Realty Trust, which was formed on January 5, 1989, and Linda Hackett along with Lisa Hackett were the co-trustees of the D&L Realty Trust, and Linda disclosed assets of the D&L Realty Trust consisting of certain real property located on Bellevue Avenue in Melrose, Massachusetts, which property was improved by a single-family house (the "**Melrose Property**"). A copy of the trust is annexed hereto as **Exhibit B**.

31. At some time prior to August 16, 2016, Lisa Hackett resigned as trustee. And by instrument recorded on August 16, 2016, Linda Hackett resigned as a trustee and Darla Mae Massad was appointed as the trustee ("**Massad as Trustee**"). A copy of the resignation is annexed as **Exhibit C**.

32. Substantially contemporaneously with her appointment, Massad as Trustee executed a Notice of Amendment of D&L Realty Trust, pursuant to which, among other things, stated, "Linda Hackett and David E. Hackett shall have no right to be beneficiaries of this Trust." A copy of the Notice of Amendment to Trust is annexed hereto as **Exhibit D**.

33. Contemporaneously with the execution of the Notice of Amendment to Trust, Massad as Trustee executed a deed, pursuant to which the Trust granted a life estate to the Hacketts in the Melrose Property. A copy of the Deed granting the Life Estate is annexed hereto as **Exhibit E**.

34. There are no public documents indicating who became the beneficiaries of the D&L Realty Trust after the Hacketts apparently relinquished their interest as beneficiaries.

35. By deed recorded January 29, 2018, Massad as Trustee conveyed the Melrose Property to a third property for the sum of $1,200,000, and the Hacketts released their life estate in the Melrose Property. A copy of the Deed is annexed hereto and incorporated herein as **Exhibit F**.

36. On February 8, 2018, the D&L Realty Trust acquired a long-term residential lease for property in Madison County, Mississippi known and numbered as Lot 23 Eastbrooke Estate Subdivision. A copy of the assignment of the long-term residential lease to D&L Realty Trust is annexed hereto as **Exhibit G**.

37. While the assignee of the long-term residential lease is D&L Realty Trust, the index and instructions indicate that the mailing address for tax notice and lease fees is to the Hacketts at 1 Eastbrooke Circle, Madison, Mississippi.

38. On information available to the Trustee, the consideration for acquiring Lot 23 Eastbrooke Estate Subdivision was $645,000.

39. On information available to the Trustee, it appears that that property was purchased by D&L Realty Trust for cash taking no deed of trust or other mortgage interest on records.

40. On information and belief, the $645,000 paid to acquire the Eastbrooke property was from the proceeds of the sale of the Melrose Property.

41. On information available to the Trustee, when the Melrose Property was sold, there were no mortgages or other encumbrances on the property. No accounting is indicated with respect to distribution of the balance of the $1.2 million proceeds from the sale.

42. On information and belief, the Hacketts are the sole occupants of the Eastbrooke property, pay all of the expenses associated with the maintenance and care of the Eastbrooke property, and are responsible for all taxes and other assessments and costs associated with the Eastbrooke property.

## COUNT I
### (To Avoid the Transfer Done by the Hacketts with Actual Intent to Hinder, Delay, or Defraud the Trustee as a Creditor)

43. The Trustee realleges and repeats the allegations contained in paragraphs 1 through 42 above and by reference incorporates them herein.

44. The relinquishment by the Hacketts of their beneficial interest in the D&L Realty Trust on August 16, 2016, shortly after they were advised of the Trustee's claims, was a transfer by the Hacketts done with the actual intent to hinder, delay, and defraud the Trustee.

45. At all times that the Hacketts transferred their interest to a third party believed to be family members and thereby relinquished their beneficial interest in the Trust, the Trustee was a creditor of the Hacketts with a claim of $580,000, representing the Hacketts' Net Winnings from their participation in the Telexfree Ponzi scheme.

46. Pursuant to § 544 of the Bankruptcy Code, the Trustee may avoid the transfer of the beneficial interest pursuant to M.G.L. c. 109A, § 5.

47.     Pursuant to § 550 of the Bankruptcy Code, to the extent that the transfer of the beneficial interest is avoided, the Trustee may recover for the benefit of the estate the value of the transferred beneficial interest, which, under the circumstances, is the proceeds from the sale of the Melrose Property up to the amount of the Hacketts' obligations to the Trustee as a Net Winner.

## COUNT II
### (For an Accounting of the proceeds from the Sale of the Melrose Property)

48.     The Trustee realleges and repeats the allegations contained in paragraphs 1 through 47 above and by reference incorporates them herein.

49.     In connection with his fraudulent transfer claim, the Trustee is entitled to an accounting with respect to the proceeds of the sale of the Melrose Property and the amount of those proceeds, if any, that were used to purchase the Eastbrooke property or otherwise transferred to third parties.

## COUNT III
### (Reach and Apply and Realty Trust)

50.     The Trustee realleges and repeats the allegations contained in paragraphs 1 through 49 above and by reference incorporates them herein.

51.     Upon receipt of an accounting with respect to the proceeds from the sale of the Melrose property, the Trustee seeks to reach and apply the proceeds held in the D&L Trust, an asset of the Hacketts.

52.     Further, to the extent the proceeds from the sale of the Melrose property are traceable to the Hacketts' acquisition of the Eastbrooke property, the Trustee is entitled to a determination that the Eastbrooke property is property of the Hacketts and the Eastbrooke property is held in a resulting trust for the benefit of the Hacketts.

769735

53. Upon the imposition of a resulting trust on the Eastbrooke property for the benefit of the Hacketts, the Trustee is entitled to reach and apply their interest in the Eastbrooke property.

## COUNT IV
### (Preliminary Injunction)

54. The Trustee realleges and repeats the allegations contained in paragraphs 1 through 53 above and by reference incorporates them herein.

55. The Trustee is entitled to a preliminary injunction restraining and enjoining the Hacketts and Massad, Trustee of the D&L Realty Trust from conveying, encumbering, transferring, pledging, or in any manner diminishing the value of the D&L Realty Trust.

56. The Trustee requires that relief in order to secure his right to reach and apply the assets of the D&L Realty Trust in satisfaction of the Trustee's likely recovery against the Hacketts and to secure an equitable lien on this asset and/or interest.

57. Based upon the allegations set forth herein, the Trustee is reasonably likely to succeed on the merits of his claim against the Hacketts.

58. If the requested injunctive relief is not granted, the Trustee will suffer irreparable harm, including the loss of the only assets available to satisfy his likely judgment against the Hacketts.

59. Conversely, the Hacketts and D&L Realty Trust will suffer no harm with the entry of the preliminary injunction since it is intended to maintain the status quo.

WHEREFORE, Stephen B. Darr, as he is the Trustee of the Chapter 11 Estates of TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc., prays that this Court:

1. Enter a Preliminary Injunction under Count IV restraining and enjoining David and Linda Hackett and Darla Mae Massad as Trustee of D&L Realty Trust from

12

769735

conveying, transferring, encumbering, pledging, or in any manner diminishing the value of the assets of D&L Realty Trust and David and Linda Hackett therein.

2. Enter Judgment for the Trustee in the amount of $580,574 plus interest and costs.

3. Determine that the relinquishment by David and Linda Hackett of their interest in the D&L Realty Trust is a fraudulent transfer.

4. Allow the Trustee to reach and apply the assets of the D&L Realty Trust to satisfy the Trustee's Judgment against David and Linda Hackett.

5. And for such other and further relief as this Court deems just and proper.

STEPHEN B. DARR AS HE IS THE TRUSTEE OF THE CHAPTER 11 ESTATES OF EACH OF THE DEBTORS

By his counsel,

 /s/ Charles R. Bennett, Jr.
Harold B. Murphy (BBO #362610)
Charles R. Bennett, Jr. (BBO #037380)
Andrew G. Lizotte (BBO #559609)
MURPHY & KING,
Professional Corporation
One Beacon Street
Boston, MA  02108
Tel: (617) 423-0400
Fax: (717) 423-0498
hmurphy@murphyking.com
cbennett@murphyking.com
alizotte@murphyking.com

Dated: February 6, 2020

## VERIFICATION

I, Stephen B. Darr, being duly sworn, depose and state that I have reviewed the allegations in the Complaint, and those allegations are true based upon the knowledge I have gained as Trustee of the Debtors and from Huron Consulting Group.

*Signed under the pains and penalties of perjury this* __6__ *day of February, 2020.*

_____
Stephen B. Darr

14

769735