## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | Chapter 11 Cases |
| TELEXFREE, LLC, | 14-40987-EDK |
| TELEXFREE, INC. and | 14-40988-EDK |
| TELEXFREE FINANCIAL, INC., | 14-40989-EDK |
| Reorganized Debtors. | Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE OF THE ESTATES OF TELEXFREE, LLC, TELEXFREE, INC. and TELEXFREE FINANCIAL, INC., | |
| Plaintiff, | Adversary Proceeding No. 16-4006 |
| v. | |
| FRANZ BALAN, A REPRESENTATIVE OF A CLASS OF DEFENDANT NET WINNERS, | |
| Defendants. | |
| STEPHEN B. DARR AS TRUSTEE OF THE ESTATES OF TELEXFREE, LLC, TELEXFREE, INC. and TELEXFREE FINANCIAL, INC., | |
| Plaintiff, | Adversary Proceeding No. 16-4007 |
| v. | |
| MARCO PUZZARINI AND SANDRO PAULO FREITAS, REPRESENTATIVES OF A CLASS OF DEFENDANT NET WINNERS, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT BETWEEN TRUSTEE AND DEFENDANT CLASSES, FOR APPROVAL OF FORM AND MANNER OF NOTICES, AND SCHEDULING FAIRNESS HEARING ON SETTLEMENT

Stephen B. Darr, the liquidating trustee ("Trustee") of the substantively consolidated debtors TelexFree LLC, TelexFree, Inc., and TelexFree Financial, Inc. (collectively, "TelexFree"), and the Defendant Class Representatives, Frantz Balan, Marco Puzzarini, and Sandro Paulo Freitas (the "Class Representatives" and, together with the Trustee, the "Parties"), on behalf of the Defendant Classes, submit this memorandum in support of the *Joint Motion for Preliminary Approval of Settlement Agreement Between Trustee and Defendant Classes, for Approval of Form and Manner of Notices, and Scheduling Fairness Hearing on Settlement* (the "Motion").

## BACKGROUND

1.      On April 13, 2014 (the "Petition Date"), the Debtors filed voluntary Chapter 11 petitions with the United States Bankruptcy Court for the District of Nevada.

2.      By order dated May 6, 2014, the Nevada Bankruptcy Court approved a motion to change venue filed by the Securities and Exchange Commission.  The cases were transferred to this Court on May 9, 2014.

3.      On May 30, 2014, the Court approved the motion of the Office of the United States Trustee to appoint a Chapter 11 trustee, and Stephen Darr was appointed Chapter 11 Trustee on June 6, 2014.

4.      On July 9, 2020, the Court entered an order confirming the *First Amended Liquidating Plan of Reorganization of Stephen Darr, Chapter 11 Trustee of TelexFree LLC, TelexFree Inc., and TelexFree Financial, Inc.*

5.      The plan became effective on July 14, 2020.  Stephen Darr was appointed liquidating trustee under the confirmed plan.  The plan resulted in the substantive consolidation of the Debtors.

6.      TelexFree purported to be a multi-level marketing company selling voice over internet protocol ("VOIP") subscriptions, which could be used to make international telephone calls over the internet.

7.      TelexFree derived most of its revenue not from the sale of VOIP plans but from membership fees paid when a person ("Participant") purchased a membership plan.  Members, or Participants, 'earned' credits by selling VOIP plans, publishing internet advertisements, and recruiting other Participants into the plan.  Credits could be redeemed for cash, used to purchase additional memberships for that Participant or another Participant, or transferred to other Participants.   In essence, the credits served as a currency and, for much of the term of the TelexFree Ponzi scheme, TelexFree recorded credits as denominated in United States currency, with one credit being equal to $1.

8.      Each time that a Participant purchased a VOIP plan or a membership plan, the Participant created an account ("User Account").  It was common for an individual Participant to have numerous User Accounts.  The TelexFree database did not have a mechanism to link User Accounts attributable to a single Participant.  Therefore, the Trustee had to establish a process for aggregating User Accounts for each Participant.  The transactional data for the aggregated User Accounts could then be used to compute the Net Winnings or Net Losses for a Participant.

**A.  Types of Participant Transactions.**

9.      In order to administer the case, the Trustee needed to compute Net Losses of Participants (to establish the pool of claimants entitled to a distribution) and Net Winnings of Participants (to identify those Participants subject to estate claims for recovery of amounts received in excess of amounts paid).   The resolution of claims of asserted Net Losers is substantially complete.

10.     In computing Net Equity, the Trustee considered the various types of transactions in which a Participant could engage.  Participants could:

- purchase membership plans and pay membership fees directly to TelexFree ("<u>Direct Payments</u>")

- purchase credits directly from TelexFree (also "<u>Direct Payments</u>")

- redeem credits directly with TelexFree.("<u>Direct Receipts</u>")

Direct Payments and Direct Receipts are collectively referred to as "<u>Direct Transactions</u>".

11.     In many instances, Participants purchased membership plans and opened User Accounts through a three-way transaction involving: (a) TelexFree, (b) the Participant purchasing the User Account (the Recruited Participant), and (c) the Participant who facilitated the transaction (the Recruiting Participant).[1]  This transaction, which has been referred to throughout the case as a "<u>Triangular Transaction</u>", operated as follows: (i) a new, or Recruited, Participant purchased a TelexFree membership plan from TelexFree; (ii) TelexFree issued the membership fee invoice to the Recruited Participant; (iii) the Recruited Participant typically paid the membership fee directly to the Recruiting Participant, and (iv) the Recruiting Participant then used accumulated credits in the TelexFree system to satisfy the invoice of the Recruited Participant.

12.     As referenced above, Participants could also transfer credits between and among themselves (referred to as "<u>Credit Transfers</u>").  TelexFree recorded the transfer of credits in its records and charged an administrative fee of three (3) credits for the bookkeeping entry.

---

[1] Occasionally, a Participant would open up additional User Accounts for himself/herself, in which case the Participant would, in effect, be both the Recruiting and Recruited Participant.

13.     On October 7, 2015, the Trustee filed a *Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief* (the "Ponzi Motion").  On November 22, 2015, the Court, on motion by the Trustee and after notice and hearing, entered an Order, as amended on December 21, 2015, approving the Ponzi Motion and finding that:

> Each of the Debtors in these jointly administered cases operated a Ponzi and pyramid scheme.  This ruling is the law of the case in each of these jointly administered cases.

14.     The Ponzi Motion also sought a determination that claims be calculated and allowed based upon a Net Equity determination, that is, the difference between amounts that a Participant paid into the scheme and amounts that the Participant received.  On January 26, 2016, the Bankruptcy Court entered a supplemental order respecting the Ponzi Motion.  The supplemental order provided that:

> The claims amounts of Participants shall be determined on a Net Equity basis, which shall be defined as follows: the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less amounts received by the Participants from the Debtors' scheme, including amounts received pursuant to Triangular Transactions…

> In determining the amount of a claim of a Participant who has more than one User Account, the activity in all of the Participants' User Accounts shall be aggregated and netted against one another…

> ("Net Equity").

15.     In this case the Trustee is the Plaintiff and the Defendant Classes consist of all of the alleged Net Winners. The Trustee designated a representative group of alleged Net winners as named Defendants and requested that the Court certify the classes and the factual and legal issues applicable to all members of the Classes.

16.     The Trustee commenced these adversary proceedings on January 15, 2016.

17.    The Court certified two classes: a class of all Net Winner Defendants residing in the United States (A.P. No 16-04006, the "Domestic Class Action") and a second class consisting of all Net Winner defendants residing outside of the United States (A.P. No 16-04007, the "Foreign Class Action", and together with the Domestic Class Action, the "Class Actions").

18.    The Domestic Action was certified by order dated October 6, 2016 and the Foreign Action was certified by order dated August 3, 2017. The law firm of Milligan, Rona, Duran & King LLC was appointed Class Counsel for the Defendant Classes in both actions.

19.    Each class consisted of

> … a "Net Winner" that is a Participant who is alleged to have received more from the Debtors and from other persons in connection with a purchase of a Plan or VOIP packages than such Participant paid to the Debtors or to other persons in connection with the purchase of Plans or VoIP packages, as determined based upon an aggregation of all activity in the User Account of a Participant (Related User Accounts).
>
> [A.P. No. 16-4006; docket 194, Order, ¶2].[2]

20.    The Court certified the class actions as proposed with no opt-out rights. [A.P. No. 16-4006, docket 194, ¶3].

21.    The Trustee retained Dr. Cameron Freer of the firm Borelian Corporation, an esteemed "big data" consulting firm, to provide expert testimony on the appropriate method of aggregating the User Accounts of Participants.

---

[2] Companion pleadings and orders were typically entered in each of the Class Actions.

22.      Dr. Freer prepared an Expert Report dated April 29, 2022 in which he provided an aggregation of Net Winner accounts based upon a probabilistic methodology.  ("Freer Report").

23.      On July 21, 2023, the Class Representatives filed a *Domestic & International Class Representatives' Motion to Exclude Testimony of Dr. Cameron E. Freer as Inadmissible Under Daubert* (the "Daubert Motion", A.P. 16-4006, docket 442].

24.      The Court conducted an evidentiary hearing on the Daubert Motion on October 11, 2023, October 12, 2023, and October 30, 2023.  By order dated November 3, 2023, the Court entered an order denying the Daubert Motion, finding that "Dr. Freer's Testimony Meets the Standard of Fed. R. Evid. 702".  [A.P. 16-4007, docket 647].

25.      Borelian's aggregation of User Accounts purportedly included the personal identifying information, including contact information, for the Participant in each User Account. The aggregation of User Accounts as set forth in the Freer Report are referred to as clusters ("User Account Clusters").

26.      Each User Account within an aggregation was assigned (by the TelexFree database SIG) a unique record identifier, or Rep ID.   Because Rep ID's were assigned in ascending order, the lowest Rep ID within a User Account Cluster would reflect the first User Account opened within a given cluster.

27.      The first-created User Account in an aggregation of the related User Accounts is referred to as the "Lowest Rep ID".

28.      Therefore, by definition, the Lowest Rep ID is the first account in a User Account Cluster, and the highest rep ID is the last account in a User Account Cluster.

29.     The initial evidentiary hearing respecting the aggregation of Net Winner User Accounts did not address: (i) the methodology of determining ownership of a User Account Cluster; or (ii) the manner of computing Net Winnings, specifically the extent to which payments made pursuant to Triangular Transactions and Credit Transfers were included within Net Winnings.

30.     On March 8, 2024, the Court entered a Final Pretrial Order for the Trial conducted on May 22, 2024, May 23, 2024, and May 31, 2024.  The matters to be heard by the Court pertaining to Phase I of the litigation included:

(i)      Whether the Trustee has established his *prima facie* case that ownership of a User Account Cluster is determined based upon the Lowest Rep ID, subject to the right of a Participant to challenge the ownership of the User Account Cluster based upon the Lowest Rep ID;

(ii)     Whether the Trustee has established his *prima facie* case that the User Account Clusters appended to the Freer Report correctly aggregate User Accounts by Participant, subject to the rights of a Participant to challenge the ownership of individual User Accounts within a User Account Cluster;

(iii)    Whether the Trustee has established his *prima facie* case that the Presumed Net Winnings for each User Account Cluster (as calculated by the Trustee and appended to the Freer Report) are accurate including the presumption that Participants received cash when serving as a Recruiting Participant in a Triangular Transaction subject to the right of a Participant to challenge cash payment amounts identified as being received by that Class Defendant in a Triangular Transaction; and

(iv)     Whether the Trustee has established that Credit Transfers are properly excluded

from the computation of Presumed Net Winnings.

(A.P. 16-4006, docket no. 506).

31.     After the evidentiary hearings were concluded, the Court directed the parties to

submit proposed findings of fact and conclusions of law as well as post-trial briefs, and the

matter was taken under advisement.

### I.     Position of the Trustee

### A.  Lowest Rep ID

32.     The Trustee selected the User Account associated with the "Lowest Rep ID" as

the basis for identifying the Participant who owned the cluster.

33.     The Trustee, after conducting his initial investigation into the scheme and based

upon his extensive business and financial experience, and applying principles of common sense,

determined that a Participant was most likely to enter correct personal identifying information

into the TelexFree records when such Participant first joined the scheme.  This information

would be necessary to facilitate payments to and from TelexFree and to provide a reliable source

of contact.

34.     At the request of the Trustee's counsel, Jean Louis Sorondo, a member of the

Huron team assigned to the TelexFree case, compared the individual names associated with the

Lowest Rep ID to the most frequent name appearing in the User Account Cluster to determine

similarity.   Mr. Sorondo concluded that the name associated with the Lowest Rep ID matched

exactly with the most frequently appearing name in the cluster approximately eighty percent

(80%) of the time.  After "cleaning" the name in the name field, the cleaned name in the User

Account associated with the Lowest Rep ID matched the most frequently appearing name in the

User Accounts Clusters approximately ninety percent (90%) of the time. For the remaining approximately 10,000 User Account aggregations, Sorondo compared the list of names associated with the Lowest Rep ID and the most frequently appearing names in the aggregation and assigned a numerical value using a Microsoft Excel tool that indicates how dissimilar the two names are. A review of this list reveals no significant differences between the name field associated with the Lowest Rep ID and the most frequently appearing name used in the aggregation.

35.    Sorondo prepared four Borelian clusters as representative examples of the relationship between the name appearing in the name field associated with the Lowest Rep ID and the most frequently appearing name in the User Account Cluster. Sorondo was able to observe that the name linked to the Lowest Rep ID appeared in ninety-eight percent (98%) of all of the name fields in the User Accounts.

### B.  Aggregation of User Accounts

36.    The Freer Report was accepted by the Court at the conclusion of the earlier hearings as having satisfied the requirements of the Federal Rules of Evidence. The Defendants had an opportunity to present countervailing arguments as to an alternative methodology for aggregating User Account Clusters but did not do so. The Trustee is therefore entitled to a presumption that the User Account Clusters are complete and accurate, subject to the rights of an individual Defendant to provide contrary evidence.

### C.  Triangular Transactions

37.    The Trustee computed Net Equity as the sum of Direct Transactions and Triangular Transactions.

38.     The Trustee concluded that it was reasonable to assume that a Recruiting Participant received cash from a Recruited Participant in a Triangular Transaction in an amount equal to the credits redeemed by the Recruiting Participant.  This conclusion was based upon discussions with TelexFree employees, discussions with, and testimony from, Participants, representations made by the Office of Homeland Security who had investigated TelexFree, and an analysis of the economics of the TelexFree scheme and the Triangular Transactions. Moreover, a Recruited Participant would not pay more than the membership invoice and, similarly, the Recruiting Participant would not access less than the redemption value of the credits.

39.     Therefore, amounts received by a Recruiting Participant in a Triangular Transaction increased that Participant's Net Winnings, and amounts paid by a Recruited Participant in a Triangular Transaction decreased that Participant's Net Winnings.

### D.  Credit Transfers

40.     The Trustee further concluded that Credit Transfers should be excluded from the computation of Net Equity.    The Net Equity formula does not contemplate the inclusion of monies paid or received in Credit Transfers.  Such inclusion would be legally unsupportable, would be inconsistent with the computation of the claims of Net Losers and would impair the rights of individual Participants to pursue their direct claims against other Participants.

41.     The Credit Transfers are different in substance from the Triangular Transactions. In a Credit Transfer, no invoice was issued by TelexFree.  No membership plan was provided by TelexFree, and no membership fee was due to TelexFree.  The transaction was strictly a purchase, sale, and transfer or credits between two private participants, in which TelexFree had no economic stake. TelexFree had no right to receive, and no obligation to pay, funds in a Credit

Transfer.  TelexFree's only role in connection with a Credit Transfer was merely as a bookkeeper – to record the reduction in credits for one Participant and increase in credits for another.  TelexFree charged three (3) credits to the transferring Participant for the bookkeeping services, which was *de minimus* in that most transfers involved hundreds, or thousands, of credits.

42.     The Net Equity formula approved by the Court distinguishes between Triangular Transactions and Credit Transfers because they are different in-kind.  The Net Equity formula expressly references and includes monies paid or received pursuant to Triangular Transactions, but no such reference is made to Credit Transfers.  The maxim *expressio unius est exclusio alterius* mandates that when parties identify specific items in a document, any items not so listed are appropriately excluded.  *Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 61 (1st Cir. 2001).

43.     The exclusion of amounts paid or received in Credit Transfers was applied in computing the Net Losses of individual Participants in the claims resolution process.  The continued implementation of this formula in the computation of Net Winnings would be consistent with, and complementary to, the process already employed in the claims resolution process.

44.     Inclusion of the Credit Transfers in computing Net Winners and Net Losers would also be inconsistent with established Ponzi scheme case law and the individual rights of Participants to pursue their own direct, as opposed to derivative, claims against third parties.  Where a transaction is between two non-debtors, and the non-debtors then separately transact with the debtor, the solely participant-to-participant transaction does not involve a claim of, or against, the bankruptcy estate.  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2nd Cir. 2014)("*Madoff I*").

45.     In the Bernie Madoff Ponzi scheme, the trustee occasionally found himself competing with victims in the pursuit of recoveries against third parties who had benefited from the scheme.  In those instances, the Madoff trustee sought to enjoin the victim from interfering in the trustee's collection efforts.  The rulings on these injunction requests varied depending upon whether the victims had "direct" claims against the third party or whether such claims were, in actuality, derivative of the claims held by the Madoff estate and were properly asserted by the trustee.

46.     In *Madoff I*, investors in feeder funds, which took investor money and in turn invested those funds into the Bernie Madoff Ponzi scheme, sued the feeder funds in connection with the scheme. The Madoff entities were not a party to the transaction between the investors and the feeder funds.  The Madoff trustee brought a separate suit against the feeder funds to recover net winnings paid by the Madoff entities to the feeder funds.

47.     The Madoff trustee commenced an action to enjoin the investors' litigation against the feeder funds, as the trustee was concerned that any recovery by the investors from the feeder funds could diminish the potential recovery by the trustee against the feeder funds. The Madoff trustee's injunction action was unsuccessful.  The court concluded that the investors had "direct" or "particularized" claims against the feeder funds because the investors had contracted directly with the feeder funds in transactions to which the Madoff entities were not a party.  The trustee therefore had no basis to enjoin the pursuit of a direct claim by a third party (the investor) against another third party (the feeder fund).

48.     *Madoff I* is analogous to the circumstances arising under the Credit Transfers. TelexFree was not a party to the Credit Transfers, and the bankruptcy estate was neither augmented nor diminished as a result of the transaction.  The transaction was strictly between

13

non-debtors.  The Trustee has no basis to recover monies paid as a result of the Credit Transfers, as these claims are direct claims that may be brought by individual Participants against other Participants.   If the trustee were to include amounts paid for Credit Transfers in the computation of Net Equity, the recipient Participant could potentially be liable twice for the same Credit Transfer (once to the Trustee as a Net Winner and then again to the counter-Participant who paid to receive the Credit Transfer).

49.     The results in *Madoff I* can be contrasted with the results of a second action commenced by the Madoff trustee to enjoin claims asserted by third parties.  *See Marshall v. Picard*, 740 F.3d 81 (2nd Cir. 2014)("*Madoff II*").  In *Madoff II*, the Madoff trustee sued the Picower defendants for excess withdrawals made by the Picower defendants from the Bernie Madoff funds that allowed them to become net winners.  Certain creditors, including Marshall, also sued the Picower defendants on account of their involvement in the Madoff scheme.  The creditor claims were based upon civil conspiracy and conversion.   The Second Circuit Court of Appeals concluded that the claims asserted by Marshall against the Picower defendants were actually derivative of the claims held by the Madoff trustee – that is, the claims arose from harm done by the Picower defendants to the bankruptcy estate and the Marshall creditors were simply repackaging estate claims under another theory.  Because the Marshall creditors were in essence seeking to recover estate property, the Court granted the Madoff trustee's injunction request.

50.     *Madoff II* is more analogous to the Triangular Transactions.  In fact, the First Circuit Court of Appeals previously determined that payment made by a Recruited Participant to a Recruiting Participant in a Triangular Transaction constituted property of the TelexFree estate.  *See Darr v. Dos Santos (In re TelexFree, LLC)*, 941 F.3d 576 (1st Cir. 2019).  The membership fee was a payment otherwise due to TelexFree for the membership invoice, and such fee was

diverted to the Recruiting Participant in exchange for the redemption of the credits of the Recruiting Participant. As a result, recovery of the amounts paid was the sole province of the Trustee, and claims by a Recruited Participant against the Recruiting Participant were derivative of the claims of the TelexFree estate and therefore could not be pursued. *Id.*

51.     Because an individual Participant had no direct claim against another Participant in a Triangular Transaction but only a claim derivative of that held by TelexFree, the Net Equity formula includes amounts paid in a Triangular Transaction. Amounts deemed received by a Recruiting Participant in a Triangular Transaction results in an increase in Net Winnings, and amounts deemed paid by a Recruited Participant in a Triangular Transaction results in a decrease in Net Winnings.

## II. Position of the Class Representatives

52.     Class Representatives believe they have demonstrated that the Trustee lacks sufficient personal knowledge and does not have reliable and admissible business records or other evidence to meet his burden of proof that: (a) he is able to identify alleged net winners on an aggregate basis; or (b) that he is able to quantify alleged net winnings on an aggregate basis. Instead, the Trustee bases his claims for liability on speculation, unproven analysis, and in many cases, false assumptions.

### A.  Lowest Rep ID

53.     The Trustee has provided no admissible evidence that the "Lowest Rep ID" identifies the Participant who owned the cluster. At best, the Trustee has simply correlated that the "Lowest Rep ID" matched the most frequently appearing name in the cluster approximately eighty percent (80%) of the time. Such claims of correlation require expert testimony that the Trustee did not offer. Further, the Trustee does not offer any evidence that the most common

name always denotes the owner of a cluster. Indeed, the unrebutted testimony in this case is that certain participants, such as Lusette Balan, did not own any accounts.

54.     Accordingly, the use of the name within the Lowest Rep ID to identify net winners replicates the unreliability of the Trustee's first expert, Timothy Martin, whose analysis was previously excluded by the Court.

55.     In excluding Mr. Martin's opinion, Judge Hoffman wrote that Mr. Martin never adequately explained why "the name field data is sufficient to support his opinion that user accounts should be aggregated primarily by using that data for the purposes of determining who the net winners are and the extent of their liability. He has not shown that his assumptions about the name field data's accuracy are reasonable and not speculative." (ECF No. 536, International Case, pg. 22.)

56.     Similarly, neither Mr. Sorondo nor Mr. Darr provided any evidence supporting their assumption that the name field should have elevated importance, accuracy, or consistency.

57.     Absent expert or direct testimony about the ownership of accounts, the Trustee's correlation calculations are irrelevant and inadmissible.

**B.  Aggregation of User Accounts**

58.     Dr. Freer's testimony was ruled admissible by the Court only after the Trustee took the position that Dr. Freer's testimony neither identified alleged net winners nor quantified any alleged winnings. *See* Final Pretrial Order (ECF Nos. 647, 655, International Case.) Dr. Freer only aggregated the user accounts into User Account Clusters. The identification of alleged net winners and calculating of net winnings was to be undertaken by Mr. Sorondo and Mr. Darr and was still disputed. (ECF Nos. 603, 606, International Case.)

59.     The Trustee relied exclusively on the testimony of Mr. Sorondo and Mr. Darr to demonstrate how Freer's clustering could be used to identify alleged net winners or quantify any alleged winnings. Both Mr. Sorondo and Mr. Darr lacked personal knowledge of the underlying subject matter. Both agreed that the Telexfree data did not show actual movements of cash other than direct transfers, which constitute a tiny fraction of the overall alleged liability. Neither Mr. Sorondo nor Mr. Darr was offered as an expert witness.

60.     The Federal Rules of Evidence do not allow lay witnesses who lack personal knowledge to speculate about the reasonableness of inferences generated from analyzing fictitious Ponzi scheme data.

61.     Further, Dr. Freer admitted that his aggregation had uncorrected errors. Neither Mr. Sorondo nor Mr. Darr has corrected or even identified the aggregation errors or has sufficient personal knowledge to make such corrections.

### C. Triangular Transactions

62.     The unrebutted testimony in this case from multiple participants is that the Telexfree data cannot be used as a proxy to show movements of cash, and that therefore the Trustee's assumption that a participant always received cash in an amount equal to the credits redeemed is unreasonable.

63.     Multiple participants testified that they did not always collect cash from recruits for a variety of reasons. For example, cash was routinely not collected from family members, friends, or people to whom accounts were gifted. Additionally, there were difficulties collecting cash from people. Frantz Balan testified that over time the price of membership plans that were actually charged fluctuated as more and more participants competed for fewer and fewer recruits. Finally, many participants testified to arrangements where a recruit would be placed "under"

their accounts without them dealing directly with the person or with a different participant collecting the cash.

64.     Frantz Balan also testified that participants routinely shared any money collected with other team members, and that no records were maintained of such sharing arrangements, making it impossible to use the Telexfree data to calculate how much money a participant made in connection with triangular transactions.

65.     The Trustee's computation of net equity bears no relation to reality. The unrebutted testimony of participants is that they did not receive the sums equivalent to the amounts of invoices that they satisfied using credits.  For example, the Trustee's data suggests that Ben Argueta received $4 million from triangular transactions, but Mr. Argueta's unrebutted testimony is that he lost money. If the data were accurate, Mr. Argueta would have received $300,000 from his brother-in-law alone. Mr. Argueta testified that this did not happen.

### D.  Credit Transfers

66.     The Trustee has erroneously and without basis excluded credit sales from net equity.

67.     The undisputed evidence shows that there were three ways to "monetize" credits, with the third being to sell credits to another participant. Participants routinely purchased and sold credits, and the testimony shows Participants did not distinguish between the different types of transactions.

68.     Frantz Balan testified that credit transfers were a necessary part of Telexfree. A participant could not accumulate credits fast enough to grow his or her business without purchasing credits. And once you accumulated credits, Telexfree made it difficult or even

impossible to redeem them, thus making credit sales a necessary way to obtain cash for credits after accumulation.

69.     The evidence shows that for the vast majority of participants, taking into account the purchase of credits lowers their net equity. This is consistent with the testimony of most participants that credit purchases were necessary to grow the business and that most participants "reinvested" any winnings into Telexfree.

70.     A necessary corollary of the preceding paragraph is that excluding credit transfers, as the Trustee does, generally overstates net equity. The resulting figures bear no relation to reality. The unrebutted testimony of every participant is that they did not earn the fantastical sums calculated by the Trustee. A significant reason is that credit transfers were excluded.

71.     The inclusion of credit sales for cash is consistent with this Court's articulation of the definition of net equity, which is defined as: "the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less amounts received by the Participant from the Debtors' scheme, including amounts received pursuant to Triangular Transactions." Ponzi Scheme Order dated January 26, 2016, Main Case, ECF No. 687, at 2-3 (emphasis added).

72.     The Trustee's argument based on the maxim for statutory construction *expressio unius est exclusio alterius* is misplaced, as the above definition of net equity also fails to mention direct transactions, which the Trustee included in net equity.  The Trustee has offered no cogent reason to exclude credit sales, and his counsel has even suggested that this Court could *sua sponte* include credit transfers to arrive at a more just result.

**PROPOSED SETTLEMENT**

73.     As a result of extensive negotiations, the Trustee and the Class Representatives have entered into the Settlement Agreement which is attached hereto, which provides substantially as follows:[3]

74.     Each Net Winner will have "<u>Presumed Net Winnings</u>" equal to the sum of: (a) 100% of their Direct Transactions; and (b) 100% of their Triangular Transactions, as set forth in each User Account Cluster.  Presumed Net Winnings exclude Net Credit Transfers.  A Net Winner shall not, however, be required to pay the full amount of the Presumed Net Winnings.

75.     The Trustee and the Class Representatives have agreed that, as part of their settlement, to include 85% of net Credit Transfers in determining a Net Winner's liability to the TelexFree estates and have agreed that, notwithstanding the amount of a Net Winner's Presumed Net Winnings, each Net Winner's "<u>Maximum Liability</u>" will not exceed the sum of: (a) 100% of net Direct Transactions; (b) 85% of net Triangular Transactions; and (c) 85% of net Credit Transfers.

76.     The Trustee shall establish an "<u>Electronic Portal</u>" where Participants can get access to the User Account Clusters attributed to them and the calculation of their Maximum Liability.  Net Winners can then elect to either settle the claim (the "*Settlement Option*") or dispute their liability to the Trustee.

77.     If a Net Winner elects the Settlement Option, they shall be required to either: (a) pay the "<u>Settlement Amount</u>" (defined below), which will be discounted by twenty percent (20%) if paid within 90 days of accessing the Electronic Portal; or (b) pay the full Settlement

---

[3] To the extent of any inconsistency between the Settlement Agreement and the summary provided herein, the terms of the Settlement Agreement shall govern.

20

Amount in installments, with interest, upon terms agreed to with the Trustee and without further

order of the Court.

78.     The Settlement Amount of the Maximum Liability shall be equal to:

(i)      0% of Maximum Liability between $0 and $24,999;

(ii)     33% of Maximum Liability between $25,000 and $99,999;

(iii)    25% of Maximum Liability between $100,000 and $249,999; and

(iv)     20% of Maximum Liability greater than $250,000.

79.     For their contributions to the case, Class Representatives shall receive a $15,000

credit against the Settlement Amount, after the discounts set forth in Section IV of the Settlement

Agreement are applied.

80.     If a Net Winner elects the Settlement Option in paragraph 77(a) and fails to timely

pay the Settlement Amount, the Trustee may file an Affidavit of noncompliance and judgment

shall enter against the Net Winner in the amount of the Maximum Liability, with notice only to

ECF parties and the affected Participant.

81.     If a Net Winner elects the Settlement Option in paragraph 77(b) after reaching

terms acceptable to the Trustee and fails to timely pay the Settlement Amount, the following

provisions shall apply:

(i)      If the Participant has paid less than 75% of the principal balance of the Settlement
Amount, the Trustee may file an Affidavit of noncompliance and judgment shall
enter against the Participant in an amount equal to: (x) one-half of the Maximum
Liability less (y) the amount of principal payments made on the Settlement
Amount (but excluding interest payments), with notice only to ECF parties and
the affected Participant;

(ii)     If a Participant has paid 75% or more of the principal balance of the Settlement
Amount, the Trustee may file an Affidavit of noncompliance and judgment shall
enter against the Participant in an amount equal to: (w) the original Settlement
Amount plus (x) interest accrued on the original Settlement Amount at the rate of
18% per annum without deduction for any payments made, plus (y) attorneys'

fees equal to 20% of the original Settlement Amount, less (z) the amount of principal payments made on the Settlement Amount (but excluding interest payments), with notice only to ECF parties and the affected Participant.

82.     Alternatively, rather than settling, a Net Winner may contest the amount of their Maximum Liability.  In such case, the Settlement Agreement provides that the Trustee shall be deemed to have established his *prima facie* case that: (a) the name associated with the Lowest Rep ID identifies the owner of a User Account Cluster; (b) each User Account Cluster accurately aggregates the User Accounts attributable to that User Account Cluster; and (c) the Presumed Net Winnings ascribed to each User Account Cluster are accurate and the Net Credit Transfers as calculated by Huron Consulting Group from SIG using the User Account Clusters are accurate. Objecting Participants may contest (a) and (b) and, in the case of (c), may contest that Cash payments were made in connection with particular Triangular Transactions or Credit Transfers. Any challenge as to particular Triangular Transactions or Credit Transfers would be applied first against the 15% discount included in the agreed Maximum Liability before reducing the Maximum Liability.  In the event a Participant contests the Maximum Liability, the Participant forfeits the right to exercise the Settlement Option.

83.     Class Counsel shall receive an amount not to exceed $100,000 from the TelexFree estates for accrued and unpaid fees and expenses, provided that no further amounts shall be paid by the TelexFree estate to any professionals retained by the Defendant Classes or their Class Representatives.

84.     Participants can also, at their own expense, engage Class Counsel on an individualized basis, to assist the Participant in further evaluating the Trustee's settlement offer and/or contesting the Trustee's *prima facie* case.

**ARGUMENT**

85.     Approval of a class action settlement is typically a two-step process.  The first step is for the Court to make a preliminary finding that the settlement satisfies the standards of Federal Rule of Civil Procedure ("FRCP")23.  The preliminary determination establishes an initial presumption of fairness.  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3rd Cir. 1995).

86.     At the preliminary approval stage, the Court need only review the settlement to determine if it is in the permissible range of possible judicial approval, warranting notice to the class and scheduling of the formal fairness hearing.  *Gabriel v. Nationwide Life Ins. Co.*, 2010 U.S. Dist. LEXIS 163837 at *15-16 (W.D. Wash. 2010).

87.     Once preliminary approval is obtained, notice of the settlement is provided to all class members in anticipation of the final fairness hearing.

88.     FRCP 23(e)(1) requires the Parties to provide the Court with sufficient information to obtain preliminary approval so that notice to the class is appropriate.  See FRCP 23(e)(1)(A). Once preliminary approval is obtained, the Court is to direct notice in a reasonable manner to all class members who would be bound upon a showing that the Court will likely be able to approve the settlement under FRCP 23(e)(2).  See FRCP 23(e)(1)(B).

89.     Pursuant to FRCP 23(e)(2), the Court may approve the Settlement Agreement after a final fairness hearing.  The Court must find that the Settlement Agreement is fair, reasonable, and adequate, after considering the following:

(i)     whether the Class Representatives and Class Counsel have adequately represented the Defendant Classes.  FRCP 23(e)(2)(A);

(ii)    whether the Settlement Agreement was negotiated at arm's length.  FRCP
23(e)(2)(B);

(iii)    whether the relief provided in the Settlement Agreement is adequate, taking into
account the costs, risks, and delay of trial and potentially appeal.  FRCP
23(e)(2)(C)(i);

(iv)    whether the settlement is effective in resolving claims against members of the
Defendant Classes.  FRCP 23(e)(2)(C)(ii);

(v)    the terms of any proposed award of attorneys' fees.  FRCP 23(e)(2)(C)(iii);

(vi)    identification of any agreements in connection with the settlement.
FRCP(e)(2)(C)(iv);

(vii)    whether the proposal treats Class members equitably relative to each other. FRCP
23(e)(2)(D).

90.    Each of these standards has been met with regard to the Settlement Agreement,
which has been filed herewith.

**I.    The Class Representatives and Class Counsel have adequately represented
the Defendant Classes.  FRCP 23(e)(2)(A).**

91.    The Defendants Classes have been well-represented by the Class Representatives
and Class Counsel.   The Class Actions were instituted as Defendant class actions, which are
infrequently implemented.  The so-called "reverse class action" was necessitated by the size of
the Defendant Classes, numbering over 80,000.  The Trustee agreed to provide funding to Class
Counsel and expert witnesses for providing a substantial contribution to the cases up to agreed
amounts, thereby ensuring that the Defendant Classes had vigorous representation. Class
Counsel has vigorously defended the Defendant Classes. For instance, Class counsel succeeded
in excluding the Trustee's initial expert, Timothy Martin, in these proceedings, which forced the

Trustee to retain an entirely new expert - Dr. Freer. Class counsel opposed the Trustee's efforts

to hire this new expert and the Trustee's requests to extend these proceedings for that purpose.

Class counsel engaged in extensive discovery and data analysis, hiring StoneTurn Consulting

Group as the Defendant Class's expert. Further, Class Counsel sought to exclude Dr. Freer's

testimony, moved for summary judgment on behalf of the Defendant Classes, and sought to

exclude the testimony and calculations of Mr. Darr and Mr. Sorondo. Class Counsel's

representation of the Defendant classes has been more than adequate.

**II.      The Settlement Agreement was negotiated at arm's length.  FRCP
23(e)(2)(B); and the relief provided in the Settlement Agreement is adequate,
taking into account the costs, risks, and delay of trial and potentially appeal.
FRCP 23(e)(2)(C)(i).**

92.      The Settlement Agreement itself is the product of several years of litigation,

discovery, and multiple days of evidentiary hearings.  The issues to be resolved in the Class

Actions have been varied and complex.  Assistance of 'big data' experts has been required to

navigate complex issues of aggregating User Account Clusters.  While the Court accepted the

Freer Report for purposes of establishing a presumption as to the accuracy of the User Account

Clusters, numerous other issues remained unresolved.

93.      The Parties contested the manner of determining ownership of a User Account

Cluster.  The Class Representatives disputed, on both legal and factual grounds, the propriety of

including Triangular Transactions in the computation of Net Equity and the exclusion of Credit

Transfers in the computation of Net Equity.  The Parties had to establish a mechanism (which

will be the Electronic Portal) for individual Net Winners to review their data and have an

opportunity to interject objections on certain issues.  The Parties also needed to consider the

costs and delays, and potentially appeals, associated with further litigation.  On balance, the

Parties concluded that the Settlement Agreement provided the best alternative for resolving the many and protracted issues faced in this litigation.

94.     In the context of a class action settlement, the Court has significant discretion to balance the benefits and costs of a settlement in applying the fair, reasonable, and adequate standard. *Voss v. Rolland*, 592 F.3d 242, 251 (1st Cir. 2010).

**III.    The settlement is effective in resolving claims against members of the Defendant Classes.  FRCP 23(e)(2)(C)(ii).**

95.     The Settlement Agreement will resolve all classwide issues in dispute, including: (i) presumptions respecting identifying the owners of each User Account Cluster; (ii) presumption as to the treatment of Triangular Transactions; (iii) presumptions as to the treatment of Credit Transfers; (iv) resolution of the Class Defendants' proofs of claim; (v) issues respecting notice to Defendants; and (vi) resolution of disputes respecting the rights of the Class Defendants' professionals to any further compensation from the estates.  At the same time, the Settlement Agreement will provide a uniform mechanism whereby individual Defendants can access their User Account information and elect to either enter into a settlement with the Trustee on a discounted basis, or to contest certain presumptions as to the calculation of their Net Winnings.  Absent the settlement, many of these issues could be the subject of further litigation and potential appeals.

**IV.    The terms of any proposed award of attorneys' fees.  FRCP 23(e)(2)(C)(iii);**

96.     Because the Class Action Litigation is a defendant class action, FRCP 23(e)(2)(C)(iii) respecting proposed attorneys' fees may be inapplicable.  There is no proposed "award" of attorneys' fees.  The estate previously agreed to pay Class Counsel's fees within a prescribed budget.   In any event, the Settlement Agreement provides for a final resolution to any

claims of the Defendants' professionals to payment of fees and expenses from the TelexFree estates.

**V.    Identification of any agreements in connection with the settlement. FRCP(e)(2)(C)(iv).**

97.    The Settlement Agreement is the governing document for this settlement, and there are no other agreements that are applicable.  The Settlement Agreement has been filed contemporaneously herewith.

**VI.    The proposal treats Class members equitably relative to each other. FRCP 23(e)(2)(D).**

98.    The Settlement Agreement provides for the same treatment to all members of the Defendant Classes, with no subclasses.

99.    The computation of Maximum Liability is uniform for each Net Winner Defendant.  Similarly, the discount percentages available for settlement are calculated uniformly for each Net Winner Defendant.  No settlement will provide for identical treatment for each of thousands of Class Defendants.  The Settlement Agreement was designed, however, to provide for members to be treated equitably, which the Parties believe has been achieved.

100.    The only differentiation is the provision that permits Class Representatives to receive a $15,000 credit against their Settlement Amount, after the discounts in Section IV of the Settlement Agreement are applied.  The Parties believe that this provision is a reasonable accommodation in consideration of the efforts and time expended by Class Representatives in connection with the prosecution of the Class Action Litigation and participation in negotiating the terms of settlement.

101.    In the aggregate, the Parties submit that the Settlement Agreement fairly, reasonably, and adequately resolves all of the class-wide issues in these cases, while preserving

the rights of individual Participants to present evidence with respect to their particular Net Winnings.

## Approval of Settlement Under Rule 9019

102.    Federal Rule of Bankruptcy Procedure ("FRBP") 9019 is separately applicable to this compromise of claims against Net Winners. *In re Cosmoledo, LLC*, 2022 Bankr. LEXIS 1137, at *19 (Bankr. S.D.N.Y. 2022); *In re Residential Cap., LLC*, 2022 Bankr. LEXIS 3601, at *205-206 (Bankr. S.D.N.Y. 2022).  FRBP 9019(a) provides, in relevant part, that "On the motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Settlements and compromises are normal parts of the process of reorganization.  While the decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court, the Court should give some deference to the business judgment of the estate representative. *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir. 1995).

103.    The Court of Appeals has described the test to be used by Bankruptcy Courts called upon to approve or reject proposed compromises and settlements as follows:

> The bankruptcy judge has the authority to approve a compromise of a claim pursuant to Bankruptcy Rule 9019(a).  The ultimate issue on appeal is whether the bankruptcy court abused its discretion when it approved the compromise, which is a process requiring the bankruptcy court to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  In re GHR Cos., 50 B.R. 925, 931 (Bankr. D. Mass. 1985) (quoting In re Boston & Providence R.R., 673 F.2d. 11, 12 (1st Cir. 1982)).  The specific factors which a bankruptcy court considers when making this determination include:  (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.  In re Anolik, 107 B.R. 427, 429 (D. Mass. 1989).

> *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).

104.     In determining whether the proposed settlement is fair and equitable, two

principles should guide the court.  First, "[c]ompromises are favored in bankruptcy[.]"

10 Lawrence P. King, Collier on Bankruptcy, ¶ 9019.01, at 9019-2 (15th ed. Rev. 1997) (citing

Marandas v. Bishop (In re Sassales), 160 B.R. 646, 653 (D. Ore. 1993)).  See also In re A & C

Properties, 784 F.2d 1377, 1381 (9th Cir. 1986) ("The law favors compromise and not

litigation[.]").  Second, settlements should be approved if they fall above the lowest point on the

continuum of reasonableness.  "[The] responsibility of the bankruptcy judge . . .  is not to decide

the numerous questions of law and fact raised  . . .  but rather to canvass the issues and see

whether the settlement fall[s] below the lowest point in the range of reasonableness."  Cosoff v.

Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2nd Cir. 1983); In re Planned Protective

Services, Inc., 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991).  Thus, the question is not whether a

better settlement might have been achieved, or a better result reached if litigation pursued.

Instead, the court should approve settlements that meet a minimal threshold of reasonableness.

Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994); 10 Collier on Bankruptcy, ¶ 9019.02, at

9019-4.

105.     The factors to be considered in approval under FRBP 9019 overlap with those of

FRCP 7023 for approval of a class action settlement.

106.     The standards for approval under FRBP 9019 have been satisfied in this case.

While the Trustee believes that he has a good likelihood of success, the outcome of the litigation

is not certain.  In particular, the treatment of Triangular Transactions and Credit Transfers are

subject to several issues of fact and law to be determined by the Court.

107.     The settlement does not resolve issues respecting collection, as it only resolve the

class-wide issues in the litigation.  The terms of the settlement, however, are designed to

encourage settlement by the Trustee with individual Net Winners.  Otherwise, settlement efforts

will involve pursuit of collection against thousands of Net Winner Defendants dispersed in

various countries.

108.    The complexity of the litigation and expense attendant to it are self-evident.  This

litigation was commenced approximately eight (8) years ago.  The Parties have resolved several

of the issues in dispute through the litigation thus far, at considerable cost, and now seek to spare

the accrual of further costs by resolving the remaining matters in dispute.

109.    The best interests of creditors are well-served by approval of the settlement,

which will avoid further costs, expense, and delay, while providing an opportunity for recoveries

by the TelexFree estates.

**Notice**

110.    Upon preliminary approval of the settlement, FRCP 23(e)(1)(B) requires that

notice of the proposed settlement be made in a reasonable manner to all Class members who

would be bound by the proposal.  Notably, FRCP 23(c)(2)(B) provides that notice may be by

electronic means.

111.    Individual notice of class proceedings is not meant to guarantee that every

member entitled to individual notice receives such notice, but it is the court's duty to ensure that

the notice ordered is reasonably calculated to reach the absent class members.  *Reppert v. Marvin

Lumber & Cedar Co*., 359 F.3d 53, 56 (1st Cir. 2004).

112.    The Trustee has retained two nationally recognized claims agents, Kurtzman

Carson Consulting and BMC Group during these cases to assist him in providing appropriate

noticing.  The claims agents will provide electronic notice to all Defendants via electronic mail at

the most recently available address.  The claims agents have confirmed that, under the

circumstances, notice by electronic mail to members of the Defendant Classes is the best and

most cost-effective form of notice. Electronic notice satisfies the due process rights of the class

members in that digital notice is the best notice practicable under the circumstances.

113.    TelexFree was an e-commerce entity which conducted business almost

exclusivity through its online presence. The Trustee has provided electronic notice to TelexFree

participants on numerous occasions, including to claimants throughout the claims resolution

process, the liquidating plan process, and in connection with any notices required to be sent to all

parties in interest.

114.    FRCP 23(c)(2) provides that the Court shall direct appropriate notice to the Class

in a circumstance where a Class has been certified under FRCP 23(b)(1) as in the instant case.

115.    The proposed form of Net Winner Notice provides a plain English explanation of

the nature and status of the Class Actions, the terms of the Settlement Agreement, and the rights

of individual Net Winners. Once approved, the Trustee will upload the settlement

documentation in English, Spanish, and Portuguese.

116.    The Net Winner Notice is intended to be a summary, not a complete source, of

information. *Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1153 (8th Cir. 1999). Defendants will

have electronic access on the TelexFree website to the full Settlement Agreement and related

pleadings if they seek additional information.

117.     The Parties submit that the Net Winner Notice is adequate and appropriate under

the circumstances, in conjunction with the website accessibility of the Settlement Agreement and

the Memorandum.

118.    Holders of allowed claims will receive the Net Loser Notice, which provides

holders of such claims with notification that a settlement has been reached and will provide a

hyperlink that will enable review of the settlement motion and memorandum.  Service of the Net

Loser Notice, as with the Net Winner Notice, shall be by electronic mail consistent with prior

practices in these cases.


Respectfully submitted,

STEPHEN B. DARR, LIQUIDATING
TRUSTEE,
By his counsel:

Dated:  August 15, 2024          /s/ Andrew G. Lizotte
                                Charles R. Bennett, Jr. (BBO #037380)
                                Andrew G. Lizotte (BBO #559609)
                                Alexandra M. Papas
                                MURPHY & KING,
                                Professional Corporation
                                28 State Street, 31st Floor
                                Boston, MA  02109
                                Telephone: (617) 423-0400
                                ALizotte@murphyking.com



                                DEFENDANT CLASS REPRESENTATIVE
                                FRANTZ BALAN
                                By his counsel,

                                /s/ Ilyas J. Rona
                                Ilyas J. Rona, Esq. (BBO #642964)
                                Michael J. Duran, Esq. (BBO #569234)
                                MILLIGAN RONA DURAN & KING LLC
                                28 State Street, Suite 802
                                Boston, Massachusetts 02109
                                (617) 395-9570
                                ijr@mrdklaw.com

DEFENDANT CLASS REPRESENTATIVES
MARCO PUZZARINI AND SANDRO PAULO
FREITAS,
By counsel,


  /s/ Ilyas J. Rona
Ilyas J. Rona, Esq. (BBO #642964)
Michael J. Duran, Esq. (BBO #569234)
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrdklaw.com

835030